132 F.3d 1267
 97 Cal. Daily Op. Serv. 9655, 97 Daily Journal
D.A.R. 15,426
Robert Maurice BLOOM, Petitioner-Appellant,
v.
Arthur CALDERON, Warden; Attorney General of the State of
California, Respondents-Appellees.
 No. 95-99005.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 31, 1997.
Decided Dec. 24, 1997.
 
 Dennis P. Riordan, Riordan & Rosenthal, San Francisco, California, for petitioner-appellant.
 Robert C. Schneider, Deputy Attorney General, Los Angeles, California, for respondents-appellees.
 Appeal from the United States District Court for the Central District of California; J. Spencer Letts, District Judge, Presiding. D.C. No. CV-90-02581-JSL.
 Before: REINHARDT, THOMPSON and HAWKINS, Circuit Judges.
 DAVID R. THOMPSON, Circuit Judge:
 
 
 1
 * OVERVIEW
 
 
 2
 A jury convicted Robert Maurice Bloom of three counts of first degree murder and imposed the death penalty. The state trial court declined to modify the jury's verdict and sentenced Bloom to death. After exhausting his state court remedies, Bloom filed his first federal habeas corpus petition in the district court. The district court denied the petition and Bloom appeals.
 
 
 3
 Bloom argues an actual conflict of interest adversely affected his state trial counsel's representation, he received ineffective assistance of counsel during the guilt phase of his trial, he is entitled to a new penalty phase trial based on his counsel's alleged ineffective assistance during the guilt phase, and his jury considered extrinsic evidence during their deliberations in the penalty phase.
 
 
 4
 We have jurisdiction pursuant to 28 U.S.C. § 2253, and we reverse. We conclude Bloom received constitutionally ineffective assistance of counsel during the guilt phase of his trial. We do not reach his other arguments.
 
 II
 FACTS
 
 5
 This is yet another case of severe childhood abuse ending in tragedy. A jury found Bloom guilty of shooting and killing his father (Robert Bloom, Sr.),[1] his stepmother (Josephine Lou Bloom), and his eight-year-old stepsister (Sandra Hughes). Bloom was eighteen years old at the time of the murders.
 
 
 6
 The prosecution presented substantial evidence against Bloom. One witness testified that approximately a week before the murders Bloom asked him if he could buy a gun because he was going to kill someone. The witness agreed to obtain a gun for Bloom but never did so. Another witness testified that two days before the murders Bloom told his father on the telephone, "You are running my life now but you won't be for long."
 
 
 7
 At the time of the murders Bloom was living with his girlfriend, Christine Waller. She testified that two days before the murders she observed Bloom walking in a field behind her house carrying a rifle. Waller's brother owned a .22-caliber semiautomatic rifle. The rifle was missing after the murders and, to date, has not been found. The victims were shot with bullets from such a rifle.
 
 
 8
 On April 22, 1982, at about 4:00 a.m., David Hughes, who lived next door to Bloom, Sr., heard Bloom, Sr. shout: "Robert, Robert. Come back." Hughes looked out the window and saw Bloom, Sr. standing at the end of the driveway. Bloom, Sr. then ran down the street toward Bloom.
 
 
 9
 Another witness, Moises Gameros, testified he then saw Bloom, Sr. and Bloom arguing in the street. Gameros heard Bloom, Sr. say: "That's it. I'm going to call the police."
 
 
 10
 Bloom, Sr. and Bloom then returned to Bloom, Sr.'s house and entered the house. Bloom was carrying a rifle but was not pointing it at anyone. Minutes later, Hughes heard shouting. Hughes saw Bloom, Sr. standing in the driveway and heard him again ask Bloom to come back. Both Hughes and Gameros then heard popping which they recognized as gunfire.
 
 
 11
 Bloom, Sr. began screaming, grabbed his midsection, and ran to his house. Bloom followed Bloom, Sr. and continued to shoot him. Bloom, Sr. eventually fell on his back in the doorway. Bloom then stood over him and shot him twice in the head.
 
 
 12
 Bloom appeared to reload the rifle before he reentered the house. Hughes heard a woman's scream followed by two shots. After a short pause, Hughes heard a third shot. Bloom walked out of the house, placed the rifle in a car belonging to Josephine, and drove off.
 
 
 13
 Police officers arrived shortly thereafter. Bloom, Sr. and Josephine were dead. Sandra was still alive, but critically wounded. Sandra had been shot in the head and had also suffered twenty-three "sharp force" stab wounds to her forehead, neck, right arm, and left back. These wounds apparently were made by scissors which were located near her body. Sandra died the next day.
 
 
 14
 Bloom was arrested within an hour after the murders. He had blood on his hands and shoes. He was not in possession of a rifle. Although the murder weapon was never found, there is no dispute that the victims were shot with a .22-caliber rifle.
 
 
 15
 Bloom initially pleaded not guilty to the three murders. Before trial, he changed his plea to the murder of Sandra to not guilty by reason of insanity.
 
 
 16
 At trial, Bloom testified that on the morning of the murder he took the rifle and chased some "cholos." He followed them until he was near Bloom, Sr.'s house. He went inside the house and placed the rifle on a chair. Bloom Sr. and Josephine were arguing because she wanted a divorce. According to Bloom, Bloom, Sr. then shot Josephine in the face and, as she was walking toward Bloom, Bloom, Sr. shot her a second time.
 
 
 17
 Bloom testified he picked up the rifle, left the house, and agreed to return only after Bloom, Sr. agreed to call the police. When they reentered the house, Bloom, Sr. refused to call the police, Bloom left the house, and, after Bloom, Sr. made a remark about Sandra, Bloom shot him. Bloom said he did not remember anything else until he was arrested.
 
 
 18
 The jury found Bloom guilty of all three counts of first degree murder. After the jury returned its verdict, Bloom withdrew his insanity plea and asked the court to let him represent himself during the penalty phase. He told the court he intended to ask the jury to return a verdict of death. The court granted Bloom's request.
 
 
 19
 During the penalty phase, the prosecution presented evidence of a prior arrest for attempted robbery and for concealing a weapon. Bloom presented no mitigating evidence. In his closing argument, he told the jurors there were no mitigating circumstances and asked them to impose the death penalty. After four hours of deliberation, the jury returned a verdict of death.
 
 
 20
 After the jury's verdict in the penalty phase, Bloom was involved in a violent jail incident. He was relieved of his self-representation status and a hearing was held to determine his competency. A jury found him to be competent. The state trial court then declined to modify the jury's verdict and sentenced Bloom to death.
 
 
 21
 The California Supreme Court consolidated Bloom's direct appeal with his appeal from the denial of his first state habeas corpus petition. The California Supreme Court affirmed Bloom's convictions, his death sentence, and affirmed the denial of his state habeas petition. People v. Bloom, 48 Cal.3d 1194, 774 P.2d 698, 259 Cal.Rptr. 669 (1989). The United States Supreme Court denied certiorari. Bloom v. California, 494 U.S. 1039, 110 S.Ct. 1503, 108 L.Ed.2d 638 (1990).
 
 
 22
 Bloom then filed his first federal habeas petition. The district court denied the petition, see Bloom v. Vasquez, 840 F.Supp. 1362 (C.D.Cal.1993), and this appeal followed.
 
 III
 DISCUSSION
 
 23
 At trial, Bloom's trial counsel pursued a defense that Bloom did not kill his stepmother, he killed his father while in a heat of passion after witnessing his father kill his stepmother, and he was in a "transitory state" when he killed his stepsister. This is the story Bloom told his counsel, and it is the story Bloom told when he testified at trial.
 
 
 24
 Bloom's defense, at least in part, was based upon his contention that he lacked the necessary mental capacity for premeditation, malice, and the intent to kill. To support this defense, Bloom's trial counsel hired Arthur S. Kling, M.D., a psychiatrist. Bloom argues his counsel's performance was constitutionally deficient because counsel inexcusably delayed hiring Dr. Kling until shortly before trial, and then did not provide Dr. Kling with necessary and available data which Kling requested and which would have assisted him in his evaluation of Bloom and in his trial testimony.
 
 
 25
 To prevail on this claim, Bloom first must establish that his " 'counsel's representation fell below an objective standard of reasonableness ... considering all the circumstances ... under prevailing professional norms.' " Harris v. Wood, 64 F.3d 1432, 1435 (9th Cir.1995) (quoting Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052, 2064-65, 80 L.Ed.2d 674 (1984)). He must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.
 
 
 26
 Bloom also must establish that prejudice resulted from the deficient performance. Harris, 64 F.3d at 1435. He must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.
 
 
 27
 As discussed in more detail below, Bloom's trial counsel did virtually nothing to obtain the services of Bloom's key witness-the psychiatrist, Dr. Kling-until only a few days before trial. Counsel then did practically nothing to prepare Dr. Kling for his examination of Bloom. This resulted in a severely damaging psychiatric report from Kling, a report the prosecution used effectively in cross-examining Kling and in closing argument.
 
 A. Preparation and Trial Evidence
 
 28
 Bloom's trial counsel was appointed on August 5, 1982. In September 1982, counsel moved the state trial court for the appointment of a psychiatrist to examine Bloom and a neurologist to conduct an electroencephalogram. On October 7, 1982, the court granted the motion, and told counsel to "fill out the form."
 
 
 29
 In November 1982, counsel sought a postponement of the trial date. The court continued the trial to January 20, 1983, and then in January continued the trial again. By March 1983, counsel still had not taken any steps to obtain a psychiatrist or neurologist, although he informed the court at that time that he needed a continuance because he was "not through with psychiatric and clinical testing as well as neurological evaluation." The trial date was continued again in May and June 1983 because counsel was involved in civil trials and he represented that this case was complex and he needed more time to prepare.
 
 
 30
 In April 1983, counsel obtained an order directing the sheriff to deliver Bloom to Dr. Sergio Fuenzalida for a neurological exam. Fuenzalida's report states Bloom "had a normal developmental history," "there is no basis for brain damage," and the electroencephalogram was "normal." The report also states Bloom said he had been experiencing blackouts since he was nine years old. The report concludes the "nature" of the blackouts is "more difficult to determine."
 
 
 31
 In May 1983, Cathy Drury, a third-year law student working in counsel's office, drafted the order appointing Dr. Kling. The appointment order consists of a form in which certain questions are marked for Kling to answer. The appointment order asked Kling to give his opinion as to whether, at the time of the murders, Bloom had the capacity to form specific intent, to deliberate, to premeditate, to harbor malice, and to meaningfully and maturely reflect upon the gravity of his acts. At this time, California had abolished the diminished capacity defense. Cal.Penal Code § 28(a), (b).
 
 
 32
 Drury drafted the order without any guidance from counsel. During the evidentiary hearing in the district court, she testified that counsel was "very rarely available" because "[h]e often would disappear for hours at a time, and he would go across the street and be at the bowling alley playing Pac-Man and we'd have to go get him. And he really wasn't available to discuss matters with." She testified everyone at the firm was "concerned about [counsel's] lack of preparation."
 
 
 33
 After drafting the appointment order, Drury left counsel's office to study for the Bar examination. After the Bar examination, she returned. On August 4, 1983, counsel asked her to contact Kling to ask him when he would have his report completed. Drury then called Kling, and he told her he "had never heard of Robert Bloom" and had not been appointed. The order Drury drafted had not been signed or filed, and the trial was to begin on August 24. Kling told Drury that, if he were appointed, he would examine Bloom on August 6 and prepare a report by August 10.
 
 
 34
 Drury panicked. She wrote counsel a note stating that she needed to draft a letter to Kling outlining the theory of defense. She testified before the district court that she had asked counsel for assistance in preparing the letter because she "didn't know what the theory of the defense of the case was...." She further testified that counsel never did discuss the theory of defense with her. The letter was never written.
 
 
 35
 Drury's notes reflect that Kling had asked counsel to provide him with "all relevant data, psychiatric and social" and "any additional information that might be available from the social history, family history, medical history." Counsel, however, did not speak with Kling prior to the Bloom interview, and provided Kling with only the following documents:
 
 
 36
 (1) The order of appointment.
 
 
 37
 (2) The transcript of the preliminary hearing.
 
 
 38
 (3) A "Make Believe Interview," which appears to be a school assignment written by Bloom. The interview merely talks about the use of drugs.
 
 
 39
 (4) An essay about crime. In this essay, Bloom states that children from broken homes may be criminally inclined and that the world is full of hate and violence, which leads to crime.
 
 
 40
 (5) A letter from Bloom's mother, Melanie Bloom, to the state trial court, which primarily complains about the performance of Bloom's counsel during the preliminary hearing.
 
 
 41
 (6) A document entitled "Things I saw Robert H. Bloom Do," apparently written by Melanie Bloom. The incidents focus primarily on Bloom getting into trouble. The incidents listed are not severe or eccentric. For example, the document states Bloom "smiles a lot" and "makes very dark dots when he writes a period."
 
 
 42
 (7) A statement from Melanie Bloom. In this document, Melanie states she had physical fights with Bloom, Sr.; hated him; and wanted to kill him. She also states she attempted suicide, had "grand mal," and referred to a pool incident in which Bloom almost died. The statement does not mention the physical abuse suffered by Bloom and makes only confused references to Bloom's mental state.
 
 
 43
 (8) Telegrams and letters from Bloom, Sr. to Bloom while Bloom, Sr. was in jail. The letters consistently state that Bloom, Sr. loves Bloom and will always be there for him.
 
 
 44
 (9) A copy of a home economics scholastic award given to Bloom in high school.
 
 
 45
 (10) A certificate of honorary discharge.
 
 
 46
 (11) Dr. Fuenzalida's neurological report.
 
 
 47
 Kling reviewed the limited materials provided by counsel and interviewed Bloom for approximately an hour-and-a-half. In his report issued in August 1983, Kling stated that, during the interview, Bloom said he killed his father because he learned Bloom, Sr. was sexually molesting his stepsister, Sandra, and he felt his father deserved to die. Bloom denied any mental illness and said he had seen a psychiatrist only once.
 
 
 48
 Kling then prepared his opinion. It was devastating. He wrote:
 
 
 49
 I would speculate that the reason he did kill his father may not have been because he found out about his father molesting [Sandra] but because his father would not let him marry or continue the relationship with [Bloom's girlfriend].
 
 
 50
 ...
 
 
 51
 I speculate further that the defendant may have killed his stepmother and his stepsister, [Sandra], to prevent them from testifying to the murder....
 
 
 52
 ...
 
 
 53
 Most remarkable is his lack of guilt, remorse, or feelings regarding his act or any of the anti-social behavior he had been engaged in. He attempts to justify everything he did without insight or judgment. His verbal ability is excellent and he has clearly no evidence of intellectual deficiency or cognitive deficit. Finally, there is no evidence of paranoid thinking or delusions or disorganized thinking which would have led to a misperception of the reality that he describes.
 
 
 54
 Kling also stated in the report his belief that, at the time of the murders, Bloom had the capacity to form the specific intent to murder and to deliberate and premeditate. He also opined that Bloom should not be admitted to a mental facility and would not benefit from treatment in a mental facility.
 
 
 55
 Kling followed his report with a letter written August 17, 1983, regarding the murder of Sandra. In that letter, Kling stated:
 
 
 56
 [T]here was no indication of any motive for him to be responsible for [Sandra's] death except for the possibility that she was a witness.
 
 
 57
 ...
 
 
 58
 [I]t would not seem unlikely, considering the extent of the injuries of Sandra Hughes and the circumstances surrounding the event, that the defendant was at the time unable to control his behavior as well as being unable to know what he was doing in a rational manner. It is not unlikely that the defendant was in a state of extreme stress, mental disorganization, and anxiety resulting from the shooting of [his] father so that the subsequent events resulting from amnesia would be in keeping with his disorganized mental state at the time.
 
 
 59
 During trial, Kling interviewed Bloom for a second time. After this interview, Kling opined Bloom had a "schizotypal personality disorder" and, as such, could experience "transient psychotic episodes" when under extreme stress. During such an episode, Bloom may suffer amnesia and "might not be aware of what it is [he is] doing."
 
 
 60
 At trial, Kling was the sole defense expert witness. On direct examination he testified in accord with his second report--that Bloom suffered from a "schizotypal personality disorder" and may experience "transient psychotic episodes." Trial counsel did not refer to Kling's first report or make any effort to diffuse it. He simply ignored it.
 
 
 61
 As might have been expected, on cross-examination the prosecution focused on Kling's first report. The prosecution brought out Kling's original opinion that Bloom was sane at the time of the murders, and that he had the capacity to know and understand what he was doing, to form the specific intent to murder, to deliberate and premeditate, to harbor malice, and to meaningfully and maturely reflect upon the gravity of his acts. This cross-examination not only negated Dr. Kling's testimony for the defense, it turned that testimony against Bloom with devastating effect. Then, in closing argument, the prosecutor returned to Kling's first report. The prosecutor read parts of the report to the jury and emphasized that Bloom's "own doctor says he was sane and that he could form the malice and premeditation and deliberation necessary for murder in the first degree." And that's what the jury convicted Bloom of, on all three counts.
 
 B. Evidence Presented by Current Counsel
 
 62
 After the death penalty was imposed, new counsel was appointed to represent Bloom in his post-conviction, post-sentencing proceedings. His new counsel presented significant evidence relating to Bloom's mental state at the time of the murders. Although this evidence was readily available to Bloom's trial counsel, his trial counsel had failed to provide the information to Dr. Kling or to any other physician who examined Bloom. The information discloses that Bloom suffered a long history of severe childhood abuse. He was born into a family plagued by generations of mental illness and domestic abuse. Both of Bloom's grandfathers physically abused their wives and Bloom, Sr. was subject to physical abuse from his father. Bloom's paternal grandfather was hospitalized "for episodes described as 'nervous breakdowns.' " There was more.
 
 
 63
 The marriage of Bloom's parents (Bloom, Sr. and Melanie) also was severely dysfunctional. Bloom, Sr. physically abused Melanie, and both Bloom, Sr. and Melanie physically abused Bloom. The physical abuse began when Bloom was very young. On one occasion, Melanie threw Bloom across the room when he was a baby. Melanie also held a gun to Bloom's head for forty-five minutes because Bloom would not reveal the identity of "Tony," Bloom's imaginary friend.
 
 
 64
 Melanie divorced Bloom, Sr. when Bloom was six years old. Bloom was then left in Bloom, Sr.'s care.
 
 
 65
 Bloom, Sr. physically abused Bloom throughout Bloom's life. The nature of this abuse is summarized as:[Bloom, Sr.] initiated an almost ritualized sequence in which he would push, slap, and punch [Bloom], all the while working himself into an escalating rage. He would then grab [Bloom] by the hair and yank his head down, throwing him to the floor. He would then pounce on [Bloom], who would be lying face down, and push his head into the floor or carpet. [Bloom, Sr.] would then pound [Bloom] with closed fists all over his back while screaming obscenities. At various other times [Bloom, Sr.] used a variety of different objects to beat [Bloom]. There are specific references, from [Bloom] and contemporary witnesses, of a telephone and a baseball bat being used.
 
 
 66
 Bloom suffered from illnesses and was exposed to medications which could affect his mental state. Since her birth, Melanie, Bloom's mother, had epilepsy and suffered grand mal seizures. During her pregnancy with Bloom, Melanie took Dilantin, which is "a powerful anti-epileptic medication now known to cause physical malformations and central nervous system damage to infants exposed prenatally to it."
 
 
 67
 When Bloom was two years old, he almost drowned in a swimming pool. He was rushed to a hospital and pronounced dead on arrival. He was revived after a cardiac injection of adrenaline.
 
 
 68
 At age eleven, Bloom became chronically ill with a nephrotic kidney condition. He was given "prednisone, a powerful steroid that often causes psychiatric consequences...." This medication caused him to develop Cushing Syndrome, which "frequently leads to psychiatric symptoms that include psychosis and agitation."
 
 
 69
 In addition to the foregoing, current counsel presented evidence that within five months before the murders, a psychiatric report had been prepared which stated Bloom was in need of inpatient psychiatric care. The report was prepared in connection with an incident which occurred in November 1981. Bloom had been arrested for robbery after he attempted to steal a purse from a woman in a bible study class. He was arrested after police officers observed him acting strangely. After this 1981 arrest, the state court appointed Dr. Richard Naham, a psychiatrist, to evaluate Bloom. In his report, Dr. Naham opines:
 
 
 70
 (1) The defendant is a potential danger to himself and to others in the community.
 
 
 71
 (2) He would benefit from inpatient psychiatric treatment in a state psychiatric hospital.
 
 
 72
 (3) He is not presently suitable for outpatient treatment.
 
 
 73
 ...
 
 
 74
 I recommend that he be committed to a state psychiatric hospital with adequate security precautions, until such time as he has improved enough to no longer be a danger to the community, and has obtained sufficient insight to benefit and participate meaningfully in outpatient psychiatric treatment. There is no doubt in my mind that without suitable inpatient psychiatric treatment he will continue to present an inordinate danger to others. (Emphasis in original).
 
 
 75
 Jail records during Bloom's pretrial and trial incarceration on the murder charges in this case also evidence the possibility that Bloom was suffering from a mental illness. Prior to trial, Bloom attempted suicide. The jail medical records show that he was referred for psychiatric observation and treatment. A jail psychologist reported that Bloom "experienced auditory and visual hallucinations and could 'see things in the future.' " Although easily obtainable, Bloom's trial counsel gathered none of this evidence.
 
 
 76
 Bloom's current counsel presented all of the foregoing information to Dr. Kling and the other physicians who evaluated Bloom. These physicians, including Dr. Kling, submitted declarations during the post-conviction, post-sentencing proceedings in which they opine that Bloom's trial counsel provided insufficient information. They state that, as a result, the initial evaluations were inaccurate, and they opine that Bloom suffers from a mental disease which affected his ability to appreciate the nature of his acts at the time of the murders. The following summarizes these current declarations.
 
 
 77
 Dr. Kling states the documents he received from Bloom's current counsel were "critical to any reliable assessment of [Bloom's] mental functioning at the time of the offenses...." He further states:
 
 
 78
 I had not been briefed on the mental state issues that would be raised at [Bloom's] trial. I viewed my original report as an effort to assess, on the basis of a brief interview, [Bloom's] ability to stand trial and to formulate a psychiatric diagnosis.
 
 
 79
 After reviewing the information provided by Bloom's current counsel, Kling opines:
 
 
 80
 Mr. Bloom's actions were triggered and governed by a predictable and intense emotional response to years of abuse and victimization by his father. Mr. Bloom's actions were not the result of deliberate reflection, thoughtful judgment, or even remote consideration of the consequences of his deeds.
 
 
 81
 ...
 
 
 82
 [A]t the time he shot his stepmother and shot and stabbed his stepsister, he was very likely in a state of mental disorganization. These latter two homicides were surely not the product of careful thought, reflection, or a weighing of consequences....
 
 
 83
 Dr. Fuenzalida, the doctor who performed the neurological evaluation for Bloom's trial, states that when he agreed to conduct the trial evaluation, he "expected to be further consulted regarding the purpose of the examination and provided with information regarding Mr. Bloom and the circumstances of the crime for which he was charged." He, however, "merely received notice that [he] had been appointed by the court and that Mr. Bloom was to be transported to [his] offices for the neurological examination." Fuenzalida was not "informed of the specific charges or of the nature of the proceedings" against Bloom and "was never told to what purpose [his] evaluation was to be used." After reviewing the documents presented by Bloom's current counsel, Fuenzalida opines:
 
 
 84
 I believe that the circumstances surrounding Mr. Bloom's referral to me and my neurological evaluation led to an incomplete and misleading assessment of Mr. Bloom's mental status at the time that I examined him.
 
 
 85
 ...
 
 
 86
 My neurological evaluation and preliminary diagnosis should not and may not be read to exclude the possibility that Mr. Bloom may have had brain damage at the time of my examination.
 
 
 87
 ...
 
 
 88
 Indeed, unaware of the purpose of my evaluation, I assumed--incorrectly--that my services were sought to determine whether Mr. Bloom suffered from a seizure disorder.
 
 
 89
 The focus of my evaluation was skewed because [trial counsel] failed to provide me with background information relevant to Mr. Bloom's mental functioning.
 
 
 90
 ...
 
 
 91
 Because I lacked even rudimentary information about the purpose of my evaluation and Mr. Bloom's history, I was forced to rely entirely on Mr. Bloom's self-reporting for this critical information. Thus, I was unable to tailor my evaluation accordingly or to interpret accurately the information provided me by Mr. Bloom.
 
 
 92
 [The information provided by current counsel] would have provided me with further avenues of inquiry, and more specifically they would have alerted me that Mr. Bloom's blackouts were not a result of seizure activity, but rather had psychiatric origins.
 
 
 93
 During the trial, other physicians had examined Bloom and reported on his mental status. After Bloom entered a plea of insanity, the state trial court appointed Dr. Julian Kivowitz to examine him. Kivowitz was asked to determine whether Bloom was sane at the time of the murders and whether he had the capacity to deliberate, premeditate, and meaningfully reflect upon the gravity of his actions.
 
 
 94
 Kivowitz states that, for his initial evaluation, he was given only the order of appointment, and at the time of the initial evaluation he was not even aware that Bloom had been charged with the murders of his stepmother and stepsister or that Bloom had entered a plea of not guilty by reason of insanity. He states the information provided by current counsel was "critically relevant" to an accurate evaluation. He opines his original evaluation "was not only irrelevant but also drastically misleading." After reviewing the information provided by current counsel, Kivowitz opines:
 
 
 95
 Mr. Bloom's actions on the day of the offense resulted from overwhelming terror that any reasonable person would experience if subjected to years of similar abuse as a child.
 
 
 96
 ...
 
 
 97
 [F]ollowing the firing of the first shot at his father, Mr. Bloom was in a transitory dissociative state, and experiencing an episode of intermittent altered mental state. Thus, due to his mental impairments and dissociative disorder, Mr. Bloom did not have the mental capacity to deliberate, to premeditate, to harbor malice, nor did Mr. Bloom have the mental capacity to meaningfully and maturely reflect upon the gravity of his contemplated acts.
 
 
 98
 The state trial court also had appointed Dr. William Vicary to examine Bloom. After the jury returned the death sentence, the state trial court appointed Vicary to determine whether Bloom was competent to be sentenced. At that time, Vicary opined Bloom was competent.
 
 
 99
 Prior to his examination of Bloom, Vicary was given only a copy of the transcript of the preliminary hearing. In a declaration submitted during the post-conviction proceedings, Vicary explains he and his staff tried to contact trial counsel prior to the examination to gain "relevant background information" on Bloom. Vicary states:
 
 
 100
 After I informed [trial counsel's] office that the clerk of the court had contacted my office and had informed me that the court desired Mr. Bloom to be examined regardless of whether I received any information about the case, I received a copy of the preliminary hearing. [Trial counsel's] office provided me with no other documents or records or any information regarding the relationship that [trial counsel] had with his client or accounts of his client's behavior.
 
 
 101
 Vicary reviewed the information provided by Bloom's current counsel and states this information "is material that I should have been provided prior to my evaluation of Mr. Bloom in 1984." After reviewing this information, Vicary opines: "Mr. Bloom's family, social, and medical history offers compelling evidence that he suffers from serious mental disorders and brain damage." Vicary states that, had he been provided with this information at the time of his original evaluation, he would have altered his conclusions. In his most recent declaration, Vicary opines:
 
 
 102
 At the time of the offenses for which Mr. Bloom has been convicted, sufficient data existed to show that his actions were the result of an explosive outburst that was precipitated by his deep terror and resentment of his father. Any reasonable person in a similar situation would react similarly. He had no plan to harm his stepmother or stepsister.
 
 
 103
 Also, during the post-conviction proceedings, Dr. Dale Watson, a psychologist, evaluated Bloom with a comprehensive neuropsychological test battery. Watson describes Bloom's abnormal behavior and opines: "The neuropsychological battery gave striking, consistent and clear evidence of cognitive sensori-motor deficits, brain dysfunction and brain damage." (Emphasis in original). He further opines "this brain damage is long-standing and pre-dates the instant offenses."
 
 
 104
 Finally, Esther Horney, a social worker, submitted a declaration during the post-conviction proceedings. Horney worked with Bloom when he was awaiting trial. Based on Bloom's "erratic behavior," Horney believed Bloom had been subject to "severe trauma." Horney states she became aware of Bloom's "clinical mental instability" after the first few sessions. She states that on "several occasions ... [Bloom] had incredibly intense outbursts.... He lost control of his body, became contorted, and screamed at the top of his lungs." Horney tried to get psychiatric help or a psychiatric evaluation to no avail. She also attempted to contact Bloom's trial counsel but was unable to. She states:
 
 
 105
 I was appalled by [trial counsel's] behavior in this case. Soon after my first visit with [Bloom], I began to try to get in touch with [trial counsel] to inform him about [Bloom's] mental problems. I continued to try to contact [trial counsel] on a weekly basis until I retired.
 
 C. Analysis
 
 106
 The complete lack of effort by Bloom's trial counsel to obtain a psychiatric expert until days before trial, combined with counsel's failure to adequately prepare his expert and then present him as a trial witness, was constitutionally deficient performance. Counsel left the responsibility of obtaining and preparing this key witness to a third-year law student who, due to counsel's lack of diligence, had no idea what defense theory counsel intended to pursue. Because counsel did not acquire the services of this key witness until days before trial, a hurried and inaccurate report resulted. Presenting the witness at trial was a disaster. "Describing [counsel's] conduct as 'strategic' strips that term of all substance." Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).
 
 
 107
 The district court found that the defense expert, Dr. Kling, had not requested any background information on Bloom and determined that, in the absence of a request, counsel was under no obligation to provide the expert with background material.
 
 
 108
 It is true that counsel does not have a duty "to acquire sufficient background material on which an expert can base reliable psychiatric conclusions, independent of any request for information from an expert...." Hendricks v. Calderon, 70 F.3d 1032, 1038 (9th Cir.1995), cert. denied, 488 U.S. 900, 109 S.Ct. 247, 102 L.Ed.2d 236 (1988). The record, however, does not support the district court's finding that Kling did not request background information on Bloom.
 
 
 109
 For its finding, the district court relied on the testimony of Bloom's counsel. During the evidentiary hearing, counsel consistently responded that he could not recall details about his representation of Bloom. When asked whether Kling had requested any materials, counsel responded, "I can't remember." Counsel did not testify that Kling did not request information.
 
 
 110
 Rather than supporting a finding that Kling did not request information, the testimony of Bloom's trial counsel supports a finding that such a request was made. When asked during the evidentiary hearing whether his "office" provided Kling with any materials prior to Kling's first examination, counsel responded that he believed a first-year law student[2] who was working in his office gave Kling some documents. During his deposition, counsel also testified:
 
 
 111
 Q: When Doctor Kling received his order appointing him to examine Bloom, did he ask for some specific materials?
 
 
 112
 A: I think he asked for prelim., some preliminary materials, and I can't recall what it was, sir....
 
 
 113
 Q: At that time did he ask you for that materials that he--
 
 
 114
 A: I can't recall.
 
 
 115
 Q: At some point he conveyed to you a desire to have some certain materials?
 
 
 116
 A: That's correct.
 
 
 117
 Kling and Drury, the law student who drafted the appointment order, testified that Kling requested background information. Drury testified Kling told her he "wanted a copy of the preliminary hearing, he wanted a copy of the police report, and he wanted a copy of all relevant data, psychiatric and social." A copy of a note written by Drury after this conversation confirms that Kling asked for "relevant data (psychiatric & social)." Kling testified that he requested "[n]europsychological tests" and "any additional information that might be available from the social history, family history, medical history."
 
 
 118
 The district court's finding that Kling did not request any information or documents is clearly erroneous. Kling requested information and a number of relevant documents, all of which were available and could have been provided, but were not. Bloom's trial counsel either had significant evidence relating to Bloom's mental state at the time of the murders, or he easily could have obtained that evidence. He had evidence that Bloom had suffered systematic abuse from childhood. He easily could have obtained the Naham report which stated Bloom was in need of inpatient psychiatric care. That report was prepared only months before the murders. Further, trial counsel never consulted Bloom's jail medical records, which were readily available. These records indicated Bloom had attempted suicide and was suffering from hallucinations.
 
 
 119
 We recognize that counsel should not be faulted for failing " 'to track down every record that might possibly relate to [the defendant's] mental health.' " Hendricks, 70 F.3d at 1038 (quoting Card v. Dugger, 911 F.2d 1494, 1512 (11th Cir.1990)). However, when the defense's only expert requests relevant information which is readily available, counsel inexplicably does not even attempt to provide it, and counsel then presents the expert's flawed testimony at trial, counsel's performance is deficient.
 
 
 120
 Trial counsel's deficient performance prejudiced Bloom during the trial phase of his case. Prejudice in this context is prejudice which "undermine[s] confidence in the outcome" of the trial. See Strickland, 466 U.S. at 694, 104 S.Ct. at 2068.
 
 
 121
 Counsel's theory of defense rested, at least in part, on a psychiatric defense. Indeed, during closing argument, trial counsel emphasized to the jury that Bloom suffered from a mental defect. Even the third-year law student knew the defense needed a psychiatric expert witness. That witness was to be Dr. Kling. As a result of trial counsel's woefully deficient performance, however, Dr. Kling was not provided with sufficient information and, as a result, his testimony not only failed to help the defense, it significantly hindered it. Kling's report (which he now acknowledges was inaccurate) permitted the prosecution to turn Kling's trial testimony against Bloom, and it gave the prosecution the ammunition it needed to secure guilty verdicts of first degree murder with special circumstances on all three counts.
 
 
 122
 The state contends that given the fanciful story Bloom told, and to which he testified at trial, evidence of Bloom's mental capacity would have undercut the theory of defense his trial counsel was stuck with. Thus, trial counsel's failure to provide his expert, Dr. Kling, with available relevant information made no difference because at best Dr. Kling would have testified to Bloom's lack of mental capacity which would have suggested to the jury that Bloom's testimony was not credible. The district court accepted this argument. We reject it.
 
 
 123
 Although trial counsel presented the defense which Bloom apparently wanted, and to which he testified at trial, trial counsel put in issue Bloom's mental capacity to premeditate, to intend to kill, and to act with malice. Trial counsel did this through the testimony of the defense expert, Dr. Kling. Once counsel presented that expert testimony, the case then focused on Bloom's mental state at the time of the murders. Kling provided this focus. What evolved was expert testimony based on Kling's ill-prepared report which the prosecution was then able to use against Bloom.
 
 
 124
 We are satisfied that had it not been for the deficient performance of Bloom's trial counsel, there is a "reasonable probability" that the verdicts "would have been different." See id. Bloom has demonstrated he received ineffective assistance of trial counsel to his prejudice in violation of the Sixth Amendment.
 
 IV
 CONCLUSION
 
 125
 Because we reverse on the ground of constitutionally ineffective assistance of trial counsel, we do not reach the merits of Bloom's other arguments.
 
 
 126
 We reverse the district court's denial of Bloom's habeas petition and remand this case to the district court with instructions to grant the writ unless the State retries Bloom within a reasonable time.
 
 
 127
 REVERSED AND REMANDED.
 
 
 
 [1]
 This opinion refers to the petitioner as "Bloom" and to his father as "Bloom, Sr."
 
 
 [2]
 This was a law student other than the third-year student, Drury