PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

JAMES NEIL TUCKER, SR.,
          *Petitioner-Appellant,*

v.

JON E. OZMINT, Director, South
Carolina Department of Corrections;
HENRY DARGAN MCMASTER,
Attorney General, State of South
Carolina,

          *Respondents-Appellees.*

No. 03-5

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Patrick Michael Duffy, District Judge.
(CA-02-1110-2-23AJ)

Argued: September 24, 2003

Decided: December 1, 2003

Before MICHAEL, MOTZ, and SHEDD, Circuit Judges.

---

Affirmed by published opinion. Judge Shedd wrote the opinion, in
which Judge Michael and Judge Motz joined.

---

## COUNSEL

**ARGUED:** Robert Edward Lominack, CENTER FOR CAPITAL
LITIGATION, Columbia, South Carolina, for Appellant. Donald John
Zelenka, Assistant Deputy Attorney General, Columbia, South Caro-

lina, for Appellees. **ON BRIEF:** Teresa L. Norris, CENTER FOR CAPITAL LITIGATION, Columbia, South Carolina; Thomas R. Haggard, Ridgeway, South Carolina, for Appellant. Henry Dargan McMaster, Attorney General, John W. McIntosh, Chief Deputy Attorney General, Columbia, South Carolina, for Appellees.

---

### OPINION

SHEDD, Circuit Judge:

James Neil Tucker was convicted by a South Carolina jury of the murder of Rosa Lee "Dolly" Oakley. Upon the jury's recommendation, the trial court sentenced Tucker to death. After his direct appeal and post-conviction review yielded no relief in the state courts, Tucker filed a petition for writ of habeas corpus in federal district court. The district court dismissed the petition. On appeal, Tucker claims that he was denied his Sixth Amendment right to effective assistance of counsel because his trial counsel (1) failed to provide the defense expert two documents relating to Tucker's childhood sexual abuse and (2) failed to discover that one of the State's three experts was subject to professional discipline at the time of trial. We issued a certificate of appealability on both of these claims. After further review, we find no error in the denial of habeas relief, and we affirm the judgment of the district court.

### I.

Dolly Oakley was in her yard at her Sumter County, South Carolina residence when Tucker pulled into her driveway on June 25, 1992.[1] Tucker pulled out a gun and forced Oakley into the house and then into her bedroom. Just as Tucker was preparing to bind Oakley with tape, Joe Black rang the doorbell. Black and James Howard (who waited outside in the car) were looking for Oakley's husband. Both

---

[1]This recitation of the facts underlying Tucker's convictions is taken from the findings contained in the Supreme Court of South Carolina's opinion disposing of Tucker's direct appeal. *See State v. Tucker*, 478 S.E.2d 260 (S.C. 1996).

Tucker and Oakley went out into the driveway as Black was leaving the house. Oakley began screaming, "Don't leave me, he's going to kill me," holding Black's arm as he sat in Howard's car. Howard panicked and drove away. Tucker dragged Oakley back into the house, took fourteen dollars from her purse, and shot her twice in the head at close range. Tucker testified that he shot her the first time when she tried to grab the gun. He shot her a second time to "put her out of her misery."

Tucker's crime spree did not end with the murder of Dolly Oakley. Still in Sumter County, he broke into the Christian Fellowship Church and later the mobile home of Kenneth Parker. Tucker moved on to neighboring Calhoun County, where he murdered another woman, Shannon Mellon, and stole her car. Tucker then drove north, abandoned the car, and crossed the state line into North Carolina. Tucker was finally captured in Maggie Valley, North Carolina on July 10, 1992. Once in custody, Tucker confessed to the murders of both Oakley and Mellon.

Tucker was first tried in Calhoun County for the murder of Shannon Mellon. That jury convicted Tucker of murder, armed robbery, first-degree burglary, and grand larceny of a vehicle. Tucker was sentenced to death. The Supreme Court of South Carolina affirmed the convictions but reversed the death sentence. *State v. Tucker*, 464 S.E.2d 105 (S.C. 1995). At a subsequent sentencing hearing, Tucker again received a death sentence, which the Supreme Court of South Carolina later affirmed. *State v. Tucker*, 512 S.E.2d 99 (S.C. 1999).

The jury in this case found Tucker guilty of murder, kidnapping, first-degree burglary, armed robbery, and possession of a weapon during a violent crime for his actions at the Oakley residence. The jury also found Tucker guilty of third-degree burglary for the break-in at Christian Fellowship Church. Finally, the jury convicted Tucker of first-degree burglary and larceny for the break-in at Parker's mobile home.

At sentencing, Tucker's counsel argued that Tucker should not receive a death sentence because he suffered from an antisocial personality disorder stemming from horrific physical and sexual abuse. Dr. Robert Noelker, an expert in forensic psychology retained by the

defense, testified that Tucker had suffered from "sustained, pro-longed, [and] severe" abuse as a child — physical abuse from his step-father and sexual abuse from his older step-brother. As a result of this abuse, Tucker "was taught that aggression was a way of getting things, being assertive, being aggressive, being violent was a way of getting something." In sum, Dr. Noelker concluded that Tucker understood the requirements of the law but lacked the ability to conform his behavior to those standards. "That inability to conform," in Dr. Noelker's opinion, was "a result of [Tucker's] life's total experiences, but more specifically as a result of his antisocial personality disorder."

The State countered Tucker's mitigation case with three expert witnesses who testified that antisocial personality disorder is merely a description of behavior, not a mental disease or defect that caused Tucker to murder Oakley. Forensic psychiatrist Dr. Richard Frierson diagnosed Tucker as having antisocial personality disorder, but he explained that "[a]ntisocial personality disorder does not affect a person's ability to choose [his] behavior. . . . The disorder does not cause criminal behavior." Likewise, Dr. Steven Shea, a clinical psychologist, testified that Tucker "has an antisocial personality disorder" but that the disorder "does not preclude [him] from choosing whether or not to act." According to Dr. Shea, "[t]he personality disorders are a way of describing people who have a certain tendency to act a certain way. It's not a mental disease in the sense that it's a — a brain disease." Finally, Dr. John Dunlap agreed with the State's other experts that antisocial personality disorder is descriptive, not causative: "Actually the diagnosis of antisocial personality is primarily a description of behavior that you have. It's not the reason you have the behaviors."

The trial court instructed the jury that it could consider four statutory aggravating factors and four statutory mitigating factors. *See* S.C. Code Ann. § 16-3-20(C)(a)-(b). In particular, the jury was instructed that it could consider as mitigating circumstances Tucker's mental or emotional disturbance, whether he acted under duress, any mental incapacity, and his age or mentality at the time of the crime. *See id.* § 16-3-20(C)(b)(2), (5)-(7). At defense counsel's request, the trial court submitted the following non-statutory mitigation factors for consideration as well: (1) cooperation with law enforcement officials, (2) circumstances surrounding Tucker's childhood, (3) circumstances

surrounding Tucker's experience in prison, (4) any non-statutory mitigating circumstances, and (5) any mitigating circumstances supported by the evidence.

The jury found the existence of three statutory aggravating factors and recommended a death sentence. The trial court then sentenced Tucker to death for the murder of Dolly Oakley, life imprisonment for kidnapping, life imprisonment for first-degree burglary, twenty-five years for armed robbery, five years for possession of a weapon, five years for third-degree burglary, and thirty days for larceny.

The Supreme Court of South Carolina affirmed the convictions and the sentence, *State v. Tucker*, 478 S.E.2d 260 (S.C. 1996), and the Supreme Court of the United States denied certiorari, *Tucker v. South Carolina*, 520 U.S. 1200 (1997). Tucker then filed an application for post-conviction relief ("PCR") in state court; after conducting an evidentiary hearing, the PCR court denied relief on the merits of Tucker's claims. The Supreme Court of South Carolina denied certiorari, as did the Supreme Court of the United States, *Tucker v. Maynard*, 534 U.S. 1073 (2002). Tucker then filed a petition for writ of habeas corpus in the district court pursuant to 28 U.S.C. § 2254. Upon a recommendation from the magistrate judge, the district court denied relief on the merits of Tucker's claims. This appeal followed.

## II.

We review *de novo* the district court's denial of habeas relief based on a state court record. *Bell v. Ozmint*, 332 F.3d 229, 233 (4th Cir. 2003). Where a state court resolved the merits of a claim for post-conviction relief, federal habeas relief is not available unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The "contrary to" and "unreasonable application" clauses of § 2254(d) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Relief is available under the "contrary to" clause "if the state court applies a rule different from the governing law set forth in

[Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Id.* Alternatively, relief is available under the "unreasonable application" clause "if the state court correctly identifies the governing legal principles from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Id.* The focus of this inquiry is "whether the state court's application of clearly established federal law is objectively unreasonable," not whether it is merely incorrect. *Id.* *See also Williams v. Taylor*, 529 U.S. 362, 409-10 (2000) (stating that habeas relief is not warranted under the "unreasonable application" clause "simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly").

To the extent that Tucker challenges certain factual findings made by the state court, federal habeas relief is available only if the state court's decision to deny post-conviction relief was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). In reviewing a state court's ruling on post-conviction relief, we are mindful that "a determination on a factual issue made by a State court shall be presumed correct," and the burden is on the petitioner to rebut this presumption "by clear and convincing evidence." *Id.* § 2254(e)(1).

Tucker contends that he was denied his Sixth Amendment right to assistance of counsel during his capital sentencing proceedings. Sixth Amendment ineffective assistance of counsel claims are governed by the familiar standards of *Strickland v. Washington*, 466 U.S. 668 (1984).[2] In order to prevail on an ineffective assistance claim, the petitioner must prove that (1) counsel's performance was deficient and (2) the deficient performance actually prejudiced the defense. *Id.* at 687.

---

[2]The state court properly identified *Strickland* as the governing legal rule, so Tucker could not obtain habeas relief under the "contrary to" clause of § 2254(d). The question presented in this appeal is whether the state court's application of *Strickland* to the particular facts of this case was objectively unreasonable. *See Bell*, 535 U.S. at 694.

Counsel's performance is deficient only if it falls "below an objective standard of reasonableness." *Id.* at 688. The Supreme Court has cautioned that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 690. Thus, in reviewing counsel's performance at trial, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

Deficient performance is prejudicial only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. Where the petitioner challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. In making this determination, a reviewing court should consider the totality of the evidence presented to the factfinder. *Id.*

A.

Tucker claims that his trial counsel were constitutionally inadequate because they failed to provide to Dr. Noelker two reports relating to Tucker's childhood sexual abuse. These records were produced by Utah authorities in connection with Tucker's juvenile detention in the 1970s. The first report, a document prepared by Floyd Bradshaw in 1970 (the "Bradshaw report"), stated that Tucker

> admits to homosexual activity with both Wayne (brother) and Randy (half-brother). He has watched them engage in various types of homosexual activity with each other. . . . He says the brothers are queers. He thinks something is wrong with him also. He feels extremely guilty about what he has done. He expresses a need to be locked up in detention for awhile. He has said on a couple of occasions that it really doesn't matter what happens to him in [c]ourt.

The second report, prepared by James Marchel in 1972 (the "Marchel report"), described Tucker's inability to get along with his stepfather:

> He feels that the relationship between himself and his step-father is beyond repair. If given his choice, he would choose any institution rather than go home.
>
> Although [Tucker's] background and development reflect[] a great deal of miss-directed [sic] and frightening sexual activity and experience, this does not appear to be the primary motivating factor for his present behavior. Rather, all of [Tucker's] delinquent behavior, including his sexual behavior, seems more to be a way of insuring that he will not be required to return to his home.
>
> . . . He is unable to relate to his [step]father, and so is constantly at odds with him. They frequently argue, and often do not speak to each other for several days at a time.

Tucker asserts that his counsel unreasonably limited the scope of their investigation into his childhood abuse, failing to provide these Utah records to Dr. Noelker as proof that Tucker reported physical and sexual abuse as early as 1970. Counsel's failure to investigate potential defenses or mitigating circumstances may amount to ineffective assistance. *Wiggins v. Smith*, ___ U.S. ___, 123 S. Ct. 2527, 2535 (2003); *Byram v. Ozmint*, 339 F.3d 203, 209 (4th Cir. 2003). As the Supreme Court has noted, however, "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 123 S. Ct. at 2541. In the end, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 2535.

The petitioner in *Wiggins* claimed that his trial counsel were ineffective for failing to obtain a social history that would have revealed childhood sexual abuse. *Id.* at 2534-35. In preparing their mitigation case, counsel relied upon (1) reports of psychological tests that revealed nothing about the Wiggins's social history, (2) a presentence investigation that included a one-page account of Wiggins's "personal

history," and (3) Department of Social Services records documenting Wiggins's placements in foster care. *Id.* at 2536. Despite the fact that the Department of Social Services record indicated significant problems in Wiggins's family life, his counsel "put on a halfhearted mitigation case" that made no mention of Wiggins's family background. *Id.* at 2537-38. As a result, only one significant mitigating factor — Wiggins's lack of a criminal history — went to the jury. *Id.* at 2543. Especially in light of the fact that the public defender made funds available for counsel to retain a forensic social worker, the Supreme Court held that counsel's failure to expand their investigation fell short of prevailing professional standards. *Id.* at 2536.

Tucker's counsel, by contrast, presented a substantial mitigation case at sentencing. They presented five witnesses, including Tucker's wife, two vocational rehabilitation workers who knew Tucker, a widow whose husband Tucker had befriended while in prison, and Dr. Noelker, a clinical psychologist qualified as an expert in forensic psychology. Dr. Noelker described at length Tucker's history of abuse as a child and its connection to Tucker's antisocial personality disorder. Dr. Noelker testified that in preparation for his testimony, he (1) interviewed Tucker on four different occasions, (2) read the voluntary statement made by Tucker in this case, (3) reviewed the deposition of the doctor who testified in Tucker's Calhoun County trial, and (4) reviewed a social history prepared by a licensed social worker in advance of the Calhoun County trial.[3] Relying upon these sources, in addition to his twenty-four years' experience as a clinical psychologist, Dr. Noelker told the jury that Tucker had a conduct disorder as a juvenile and more recently was diagnosed with antisocial personality disorder.

According to Dr. Noelker, Tucker's personality disorder was likely caused by "early sexual and/or physical abuse, early and sustained parental indifference and/or the lack of concern or care, the lack of

---

[3]Trial counsel testified that they made a calculated decision not to call the social worker as a witness based on her performance as a witness in the Calhoun County trial. Nevertheless, counsel did believe that the social history she prepared was complete and accurate. Tucker has not directly challenged counsel's decision not to call the social worker as a witness, nor would such a challenge succeed under *Strickland*.

a solid role model as a parent." Dr. Noelker testified, Tucker, at only eighteen months of age, was found abandoned in a locked car with a broken leg; that his parents fled the state in order to avoid prosecution; and that Tucker was the target of sexual and physical abuse from family members until he was about eleven years old. As a result of this abuse, Dr. Noelker testified that Tucker was unable to conform his behavior to common standards. The record leaves no doubt that the jury was offered a clear, coherent mitigation case that focused on Tucker's history of abuse.

Counsel's performance in preparing Tucker's mitigation case far surpassed the inadequate performance described in *Wiggins*.[4] Counsel attended the previous trial, made reasoned judgments about which witnesses to call, and presented an expert psychologist who gave the jury a full picture of Tucker's disturbing social history. "Although counsel should conduct a reasonable investigation into potential defenses, *Strickland* does not impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help their client." *Green v. French*, 143 F.3d 865, 892 (4th Cir. 1998), *abrogated on other grounds by Williams v. Taylor*, 529 U.S. 362 (2000). *See also Byram*, 339 F.3d at 211 (holding that trial counsel were not ineffective for failing to obtain adoption records that would have provided additional proof that the petitioner suffered from fetal alcohol syndrome). In this case, trial counsel reasonably investigated

---

[4]Counsel's performance also surpassed the inadequate performance described in *Bloom v. Calderon*, 132 F.3d 1267 (9th Cir. 1997), upon which Tucker relies. Counsel in *Bloom* "did practically nothing" to prepare the defense expert for his examination of the petitioner. *Id.* at 1271. Counsel never spoke to the expert before his interview with the petitioner, nor did he provide the expert with documents that the expert affirmatively requested. *Id.* at 1272. After a quick look at the few documents provided by counsel and an interview with the petitioner, the defense expert prepared a report that the Ninth Circuit described as "devastating" to the petitioner. *Id.* After a subsequent interview with the petitioner, the expert revised his opinion significantly. 132 F.3d at 1273. On direct examination, counsel simply ignored the first report and made no attempt to minimize its certain impact on cross-examination. *Id.* These facts — suggesting a near-total absence of assistance of counsel — bear no resemblance to the facts of this case. Tucker's reliance upon *Bloom* is altogether misplaced.

Tucker's history of abuse and presented a thorough mitigation case at sentencing. We conclude, therefore, that the state court's decision was not an unreasonable application of *Strickland*'s performance requirement.

Even if counsel's performance was unreasonable, their error did not result in prejudice. In determining whether counsel's allegedly unreasonable performance resulted in prejudice to Tucker's sentence, we "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 123 S. Ct. at 2542. A finding of prejudice is appropriate only if the facts "undermine confidence in the outcome" of the proceeding, in this case a death sentence. *Strickland*, 466 U.S. at 694.

The State offered substantial evidence of aggravating circumstances. Specifically, the State proved three statutory aggravating factors — kidnapping, burglary, and armed robbery at the Oakley residence. The jury also heard evidence of the crime spree that followed as Tucker fled Sumter County, his murder of Shannon Mellon in Calhoun County, a series of burglaries and other property crimes, and his ultimate capture. The jury also heard testimony describing Tucker's past violent crimes.

As the centerpiece of Tucker's case in mitigation, Dr. Noelker testified that Tucker suffered from antisocial personality disorder stemming from childhood physical and sexual abuse. According to Dr. Noelker, Tucker "was — was and is — a severely, if not profoundly[,] physically and sexually abused child and he carries those characteristics with him into adulthood." After recounting specific episodes of abuse from Tucker's childhood, Dr. Noelker testified that he was "convinced" and it was his "professional opinion" that Tucker was "both physically and sexually abused" from an early age. The result of this abuse, said Dr. Noelker, was an antisocial personality disorder that rendered Tucker unable to conform his behavior to common standards.

Tucker now argues that his mitigation case would have been stronger had Dr. Noelker been able to refute the State's cross-examination with the Utah juvenile records. On cross-examination, the solicitor suggested that Tucker had fabricated his claims of child-

hood abuse in order to avoid a death sentence. Tucker asserts that the Utah juvenile records would have proved that he reported abuse as early as 1970.

We doubt that the result of the sentencing proceeding turned on the adequacy of Dr. Noelker's response to the solicitor's argument. In fact, *all* of the expert witnesses — even the State's experts — agreed that Tucker had been abused as a child. One of the State's experts, Dr. Steven Shea, testified that he personally believed Tucker was abused as a child, sometimes severely. Given this uniform *evidence* of abuse, we do not think it likely that the solicitor's *argument* suggesting fabrication significantly undermined Tucker's mitigation case.

Moreover, it is not at all clear that the Utah juvenile records would have answered the solicitor's charge of fabrication. Indeed, the most those records showed was that Tucker told authorities — again in the context of criminal proceedings — that he had a troubled relationship with his father and that he had previously engaged in disturbing, even "frightening," sexual conduct with his step-brother. These records do not reflect contemporaneous reports of abuse by Tucker. And that was the solicitor's point: No one ever lodged a complaint against Tucker's step-father or step-brother at the times when the abuse was alleged to have occurred, and no one other than Tucker himself ever reported such abuse before this trial.[5] Thus, it is altogether possible — indeed likely — that the solicitor would have maintained his charge of fabrication even if Dr. Noelker had made reference to the Utah juvenile records.

Finally, Dr. Noelker answered the solicitor's cross-examination by stating unequivocally that his conclusions were not affected by the timing of Tucker's allegations of abuse. Based on his review of other records (including the social history prepared for the Calhoun County trial) and his own interviews with Tucker, Dr. Noelker believed that Tucker had been subject to physical and sexual abuse during his childhood. This abuse, according to Dr. Noelker, resulted in the

---

[5]Tucker's trial counsel apparently understood this to be the substance of the solicitor's argument when he stipulated that the family never reported to law enforcement authorities what one brother had done to the other.

development of a personality disorder, which caused Tucker to engage in aggressive and violent behaviors. Even after reviewing the Utah juvenile records, Dr. Noelker stated that he had not seen "any substantial differences" that would cause him to change his conclusions.

On balance, there is no reason to lack confidence as to the outcome in this case because the aggravating circumstances submitted to the jury outweighed the mitigating circumstances. Tucker's best case was that he suffered from an antisocial personality disorder caused by terrible physical and sexual abuse as a child. Dr. Noelker made this case, but the State's experts uniformly testified that antisocial personality disorder is merely descriptive and does not explain the cause for Tucker's criminal behavior. Dr. Noelker's opinion was unaffected by the two Utah juvenile records, and we doubt that his mentioning those records in response to the State's cross-examination would have bolstered Tucker's mitigation case in any significant sense. The state court's application of *Strickland*'s prejudice requirement was not unreasonable, and the district court properly denied habeas relief on this claim.[6]

---

[6]Tucker contends that some of the state court's factual findings were unreasonable in light of the record evidence. Specifically, Tucker takes issue with the following factual findings made by the PCR court: (1) Tucker "expressed a desire that counsel not make an issue of any sexual abuse," (2) trial counsel determined that "there really were not many family members or friends who were helpful in the defense's pretrial preparation," and (3) the Utah documents did not indicate that Tucker was sexually abused but "merely reflect that he engaged in homosexual activity, and that he felt guilty about it." We need not determine whether these findings were unreasonable, since they are not necessary to reach the conclusion that Tucker's counsel acted reasonably in their investigation and presentation of Tucker's childhood abuse. Accordingly, Tucker is not entitled to relief under 28 U.S.C. § 2254(d)(2), which authorizes relief only where the state court's decision was "based on" an unreasonable determination of the facts.

Tucker also takes issue with the PCR court's reliance upon his statement to the jury that there was no excuse for his conduct. The Supreme Court of South Carolina agreed with Tucker on this point, citing *Johnson v. Catoe*, 520 S.E.2d 617 (S.C. 1999), but nevertheless affirmed the PCR court's conclusion that Tucker could not demonstrate prejudice. In accordance with the Supreme Court of South Carolina's ruling, we have given no weight to the PCR court's reliance upon Tucker's closing statement.

### B.

Tucker also contends that his counsel were ineffective for failing to investigate and challenge the qualifications of Dr. John Dunlap, one of the State's three expert witnesses. Post-conviction counsel learned that Dunlap was on probation from the practice of medicine at the time of Tucker's trial, and Tucker now claims that his trial counsel should have discovered that information before or during Dr. Dunlap's testimony. According to Tucker, this information was necessary to destroy Dr. Dunlap's credibility and cast doubt on the State's argument that antisocial personality disorder could not excuse Tucker's criminal conduct.

Trial counsel have an obligation to investigate possible methods for impeaching a prosecution witness, and failure to do so may constitute ineffective assistance of counsel. *Huffington v. Nuth*, 140 F.3d 572, 580 (4th Cir. 1998); *Hoots v. Allsbrook*, 785 F.2d 1214, 1221 (4th Cir. 1986). The reasonableness of the investigation depends, in part, upon the importance of the witness to the prosecution's case: "Although a lawyer's failure to investigate a witness who has been identified as crucial may indicate an inadequate investigation, the failure to investigate everyone whose name happens to be mentioned by the defendant does not suggest ineffective assistance." *Huffington*, 140 F.3d at 580. As we noted in *Huffington*, most of the witnesses whom federal courts have deemed "crucial" were "alibi witnesses or eyewitnesses critical to the determination of guilt," such as self-defense witnesses. *Id.*

We disagree with Tucker's contention that trial counsel were required to discover Dr. Dunlap's disciplinary record or conduct cross-examination on that issue absent some prior or contemporaneous indication that his professional status was in question. At the outset, Dr. Dunlap was not a crucial witness under *Huffington*. He was one of three rebuttal witnesses called by the State to refute Tucker's contention that his antisocial personality disorder was a mental illness warranting leniency in sentencing. Of these three witnesses, Dr. Dunlap was the only one who had never met nor examined Tucker. Dr. Dunlap's role in this case was hardly analogous to the role of "alibi

witnesses or eyewitnesses critical to the determination of guilt." *Huffington*, 140 F.3d at 580.[7]

Although trial counsel were aware that Dr. Dunlap would testify, they had no reason to suspect that his professional status would be an issue. It is undisputed that neither the solicitor nor trial counsel were aware of Dr. Dunlap's probation at the time of trial. (Indeed, the solicitor testified that Dr. Dunlap appeared to be practicing without restriction at the time he was called to testify in this case.) It is also undisputed that Dr. Dunlap's direct testimony did not alert counsel to any issue concerning his status. As the PCR court noted, the only way to find out about Dr. Dunlap's record would have been to subpoena documents from, or file a FOIA request with, the Board of Medical Examiners. Trial counsel do not act unreasonably by failing to conduct such investigations on non-crucial expert witnesses.

Moreover, Tucker's counsel *did* attempt to impeach Dr. Dunlap's expert testimony by establishing that his testimony was purely speculative. Dr. Dunlap admitted that he had never examined Tucker nor even spoken to him, nor had Dr. Dunlap heard Dr. Noelker's testimony. Based on these admissions, trial counsel moved to exclude Dr. Dunlap's testimony. Although their motion was denied, counsel argued to the jury that Dr. Dunlap's testimony should not be credited because he knew so little about Tucker's particular condition. As the district court noted, "this is not a case where trial counsel made no effort to investigate and pursue avenues of impeachment; rather, trial counsel simply failed to uncover the precise impeachment evidence that current counsel was subsequently able to obtain." It is not enough

---

[7]We do not in any way suggest that the only witnesses who may be deemed "crucial" under *Huffington* are alibi witnesses or eyewitnesses to the alleged crime. Of course, the sentencing phase of a capital trial naturally raises different considerations for the jury than the guilt phase, when alibi witnesses or eyewitnesses to the crime are often critical. Whether a sentencing phase witness was "crucial" must be evaluated in light of the issues relevant to sentencing. Post-conviction counsel's backward-looking characterization of the role of any particular witness should have no bearing on this question. *See Strickland*, 466 U.S. at 689-90 (cautioning reviewing courts to evaluate trial counsel's performance "as of the time of counsel's conduct").

that post-conviction counsel managed to discover Dr. Dunlap's disciplinary problems; as with all claims of ineffective assistance of counsel, we are mindful that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689.

Even if Tucker could demonstrate that his counsel's performance was unreasonable under the circumstances, he has not shown that he was prejudiced by trial counsel's failure to expose Dr. Dunlap's probation. Counsel highlighted the speculative nature of Dr. Dunlap's testimony, arguing to the jury that an opinion based upon general principles rather than an examination of Tucker himself should not be given any weight. In addition, Dr. Dunlap's testimony concerning a diagnosis of antisocial personality disorder was cumulative to the prior testimony of Drs. Frierson and Shea. Like Drs. Frierson and Shea, Dr. Dunlap testified that antisocial personality disorder is merely descriptive, not causative. Thus, with or without Dr. Dunlap's testimony, the jury was presented with the State's theory that although Tucker was abused as a child and had an antisocial personality disorder, this disorder did not cause him to engage in criminal activity.

Considering the aggravating and mitigating circumstances present in this case, we conclude that any error on this score would not "undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. The state court's decision was not an unreasonable application of *Strickland*, and the district court properly denied habeas relief on this claim.

### III.

Tucker's ineffective assistance claims fail to satisfy the requirements of *Strickland*, and the state court's denial of Tucker's claims was not an unreasonable application of federal law. Accordingly, the judgment of the district court is

*AFFIRMED.*