158 F.3d 449
 98 Cal. Daily Op. Serv. 7692, 98 Daily Journal
D.A.R. 10,652,
98 Daily Journal D.A.R. 11,961
Billy Carl TURNER, Petitioner-Appellant,
v.
William DUNCAN, Warden; Daniel E. Lungren, Attorney General
of the State of California, Respondents-Appellees.
 No. 97-56098.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 3, 1998.
Decided Oct. 8, 1998.
As Amended on Denial of Rehearing and Suggestion for
Rehearing En Banc Nov. 24, 1998.
 
 Mark R. McDonald and Steven M. Haines, Morrison & Foerster, Los Angeles, California, for petitioner-appellant.
 Victoria Bedrossian, Deputy Attorney General, Los Angeles, California, for respondents-appellees.
 Appeal from the United States District Court for the Central District of California; Mariana R. Pfaelzer, District Judge, Presiding. D.C. No. CV-95-00079-MRP.
 Before: REINHARDT, TROTT, and T.G. NELSON, Circuit Judges.
 REINHARDT, Circuit Judge.
 
 
 1
 Billy Carl Turner, a defendant facing first degree murder charges, paid an attorney $1000 to represent him at trial. In return, his lawyer delivered one of the most minimal efforts we have seen in a case of this magnitude. Turner's attorney failed to take even the most basic steps to investigate and prepare Turner's defense, although evidence relevant to his mental state was readily available and could have been discovered simply by reading the case file. This deficient representation deprived Turner of the best evidence that he could have presented to corroborate his testimony that he had killed the victim, Arthur Dennis, while in a state of anger and fear due to months of severe physical and sexual abuse. We therefore reverse the district court's denial of the habeas petition and remand for an evidentiary hearing on the question of prejudice.BACKGROUND
 
 
 2
 At the time of the murder, Turner lived in a boarding house with five other individuals, including Dennis, who had moved into the house after his release from prison in early 1981. Turner's only previous criminal convictions were for driving under the influence.
 
 
 3
 On the evening of September 18, 1981, Turner--carrying a jar of liquid--walked into one of the house's bedrooms, where his housemates Henry Ross, William Berry and Ida Mae Seales were sitting and listening to the radio. Turner sat down briefly and had a drink. He then arose, stated that he was going to "get that black bitch," and left the room.[1] Dennis, who had been lying on the couch in the living room, possibly asleep,[2] appeared three to five minutes later at the bedroom door, "all in flames." Dennis died from his burns the next day.
 
 
 4
 Over the next two days, Turner gave conflicting statements to fire and police investigators.[3] He ultimately admitted that he had killed Dennis by throwing gasoline on him and setting him on fire, claiming that he had done so in reaction to a sexual threat by Dennis which followed months of sexual and physical abuse.
 
 
 5
 After Turner was indicted, the court appointed public defender Joy Wilensky to represent him. The public defender launched an investigation, interviewing a number of witnesses who had seen or heard of abusive and violent behavior by Dennis and had witnessed Dennis threaten Turner. At least one of the witnesses corroborated Turner's testimony by confirming that Turner had made contemporaneous complaints about Dennis's abuse. Laverne Love recounted prior conversations with Turner in which he had reported his fear of Dennis, and had said that Dennis had physically and sexually threatened him. Turner's housemate Seales stated that she had heard Dennis threaten Turner with bodily harm. Another house resident, Berry, stated that he had fought with Dennis in the past and that he had witnessed Dennis choke two women, one with a board across her throat after she refused to have sex with him. Berry and Seales also characterized Dennis as an aggressive individual with a bad temper, and Turner as a "nice" and nonaggressive person.
 
 
 6
 The public defender also arranged for a court appointed psychiatrist, Dr. Alvin Davis, to examine Turner. Dr. Davis's 1981 report stated that Turner had "acted impulsively in reaction to fear and anger at past abuse by victim, and to threat of current and future physical and sexual abuse by him." Dr. Davis concluded that Turner was "not a danger to others," that the offense was "a single isolated instance of violence, highly provoked by victim at the time and by ongoing provocation that was overly stressful to Defendant." He further stated that Turner had the mental capacity to form specific intent, to briefly premeditate, and to harbor malice, but not "to deliberate or maturely reflect, because of fear and immediate threat, and his passive personality." Turner had acted "in what he experienced as self-defense with no viable alternative to taking action himself."[4]
 
 
 7
 Turner, concerned that the public defender would be unable to mount a sufficient investigation, followed his mother's advice and retained private counsel, Andrew Smyth, for a $1000 fee. His mother, who had discovered Smyth through an advertisement Smyth had placed, paid Smyth's fee. Smyth had represented one previous defendant in a murder trial; that conviction was overturned for ineffective assistance of counsel. On the day that the court granted Turner's motion for substitution of counsel, Wilensky turned over to Smyth "all subpoenas, psychiatric letters, the police reports, [and] the results of [her] discovery," and promised to also forward to him a summary of her investigation reports.
 
 
 8
 After taking over Turner's defense, Smyth did almost nothing--in the words of the magistrate judge, he exhibited "a startling lack of preparation for trial"--failing to perform even the most basic investigative tasks. In a declaration prepared for purposes of these habeas proceedings, Smyth admits that his only preparation for trial consisted of reviewing the transcript of the preliminary hearing and spending between twenty and forty five minutes interviewing Turner. He acknowledges that he made no attempt to find or interview any prosecution or defense witnesses, although Turner had told him of the existence of individuals who "had been badly beaten and choked by the victim" and he knew that the prosecution was planning to call Turner's housemates to the stand. He also concedes that he did "not recall reviewing any file, psychiatrist report or document" provided by Turner's public defender; he therefore did not discover the existence of witnesses who would have corroborated Turner's testimony about past abuse by Dennis, and did not realize that Dr. Davis had evaluated Turner and written a report that was in the file. Accordingly, Smyth did not offer the psychiatric report into evidence or call Dr. Davis as a witness at trial. Finally, Smyth admits that he conducted no discovery and did no legal research in preparation for the case.
 
 
 9
 The trial lasted less than a day and a half. The prosecution presented two residents of the boarding house, Berry and Ross, who testified about their observations on the evening of September 18. On cross-examination, Smyth asked Berry whether he had ever seen Dennis attack a woman and hold a stick to her throat; when Berry responded affirmatively, Smyth did not request further details and therefore did not bring to the jury's attention that this attack was in response to the woman's refusal to have sex with Dennis. Both the prosecutor and Smyth also elicited testimony from Ross and Berry about past physical conflicts with both Dennis and Turner. The prosecution also presented an arson investigator and a police detective, who testified about Turner's conflicting statements in the hours and days following the killing.
 
 
 10
 The defense advanced a heat of passion defense but called only one witness, Turner. The record suggests that Smyth spent almost no time preparing Turner to testify. In his testimony, Turner admitted killing Dennis by setting him on fire. He testified that he had done so in response to repeated physical attacks and rapes by Dennis, including incidents in which Dennis had sodomized him with a mop handle and defecated and urinated on him.[5] Turner also testified that Dennis stole his money and threatened to kill him if he went to the police. He claimed that he had set fire to Dennis on the "spur of the moment" in reaction to Dennis's pulling out his penis and indicating a desire for sex, and that he had purchased the gasoline that he used to set Dennis on fire two days earlier for use in cleaning his floor.
 
 
 11
 The prosecution undermined Turner's credibility in cross-examination and in its closing argument by emphasizing the inconsistencies in his statements to the police and his failure to present any corroboration of his claims of past abuse. The prosecution also suggested that Turner and Dennis were consensual lovers, and cross-examined Turner extensively about why he didn't leave the boarding house or report the abuse to the police. Turner appeared to be totally unprepared to respond to these questions.
 
 
 12
 The judge instructed the jury on alternate theories under which Turner could be convicted of first degree murder: if he committed a willful, deliberate, premeditated killing with malice aforethought,[6] murder by torture, and/or murder preceded by lying in wait. The jury convicted Turner of first degree murder. The verdict form did not specify under which theory the jury had convicted him.
 
 
 13
 After Turner's conviction, Smyth handled the appeal, for which he received an additional $1000 from Turner's mother. Smyth admits that he did no legal research before filing a Wende brief asserting that he found no meritorious grounds for appeal.
 
 
 14
 Since his conviction, Turner has filed four federal habeas corpus petitions in addition to multiple petitions in California state court--all pro se until the petition now before us on appeal. Turner's first federal petition was dismissed without prejudice because of failure to exhaust state remedies, while his second and third petitions were dismissed on the merits, without hearing or oral argument. In 1989, the law firm of Hufstedler & Kaus agreed to represent Turner pro bono, and subsequently initiated an investigation of his case. After what the firm estimates to have been several hundred hours of investigation, it filed a state habeas petition on Turner's behalf in 1991, which was again denied without a hearing, and then this federal habeas petition in 1995.
 
 
 15
 The state initially did not respond to the 1995 petition on the merits, but argued that it should be dismissed for abuse of the writ because it raised claims that Turner could have made in earlier habeas petitions. However, in May 1996 the magistrate judge declared that the claim that trial counsel was ineffective "may not be procedurally barred" and ordered the state to file a supplemental return addressing the merits of the claim. The state did so. The magistrate judge, without holding an evidentiary hearing, recommended habeas relief for the petitioner based on the cumulative prejudicial impact of trial counsel's failure to consult with petitioner before trial, investigate witnesses, follow up on the psychiatric report, undertake discovery, research any legal issues, or call any witnesses other than petitioner.
 
 
 16
 The state filed objections to the magistrate judge's report and recommendation with the district judge, arguing that the Antiterrorism and Effective Death Penalty Act (AEDPA) barred Turner from bringing claims that had been previously rejected by California state courts and contesting the petition on the merits. The state did not object on the ground of abuse of the writ. The district court rejected the state's argument that Turner's petition was subject to the AEDPA and reached the merits of Turner's petition. In ruling on the petition, the district court assumed that trial counsel's failure to investigate and to review the case file constituted deficient performance.[7] However, the district court concluded that the deficient performance did not prejudice Turner:
 
 
 17
 The undisputed facts surrounding the underlying offense for which the petitioner was convicted are such that trial counsel's deficiencies fall far short of undermining confidence in the outcome of petitioner's trial. Although the petitioner's present counsel has arguably made a good case that the outcome of the trial might have been different if the trial occurred today and petitioner's trial counsel did not perform deficiently under prevailing professional norms, it is highly unlikely that constitutionally adequate performance by trial counsel in 1982 would have resulted in a different verdict.
 
 
 18
 The district court gave no further explanation of its holding that the existence of prejudice depended on the timing of the trial, but denied the petition on that basis. This timely appeal followed.
 
 ABUSE OF THE WRIT
 
 19
 The state now argues that the district court should not have reached the merits of Turner's petition, because Turner abused the writ by raising new claims that he could have asserted in earlier habeas petitions. However, the state waived this argument by failing to raise it when it filed its objections to the magistrate judge's recommendations.
 
 
 20
 Failure to object to a magistrate judge's recommendation waives all objections to the magistrate judge's findings of fact. See Smith v. Frank, 923 F.2d 139, 141 (9th Cir.1991); Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir.1991). While in most other circuits, failure to object also waives any objection to purely legal conclusions, see Thomas v. Arn, 474 U.S. 140, 146 n. 4, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Douglass v. United Services Automobile Ass'n, 79 F.3d 1415, 1421 n. 7, 1423 & n. 10 (5th Cir.1996), that is ordinarily not the case in this circuit. See Baxter, 923 F.2d at 1394. Rather, a failure to object to such a conclusion "is a factor to be weighed in considering the propriety of finding waiver of an issue on appeal." Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir.1991) (citing McCall v. Andrus, 628 F.2d 1185, 1187 (9th Cir.1980)).
 
 
 21
 The question whether a petitioner has abused the writ, and, if so, whether he has demonstrated cause and prejudice to overcome the procedural barrier that arises, ordinarily does not involve a pure question of law but factual issues as well, and is usually left to the discretion of district courts to decide on a case by case basis, see Farmer v. McDaniel, 98 F.3d 1548, 1554 (9th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 1474, 137 L.Ed.2d 686 (1997) (citing Habeas Corpus Rule 9, Advisory Committee Notes, at 801), subject to review under an abuse of discretion standard. See United States v. Gutierrez, 116 F.3d 412, 415 (9th Cir.1997).
 
 
 22
 Here, although Turner made a specific evidentiary showing by way of affidavit that he had cause to excuse any default, the magistrate judge did not hold an evidentiary hearing on that question and did not make any findings regarding the abuse of the writ issue, although the state had raised it before her. When the magistrate judge issued her recommendations, and they related solely to the merits, the state failed to raise an objection before the district judge to any of the magistrate judge's actions, never argued to the district judge that the habeas petition should have been dismissed on abuse of the writ grounds, and did not challenge the magistrate judge's failure to make findings on that question. Before the district judge, the state simply ignored the abuse of the writ issue entirely and instead elected to submit objections only regarding the decision on the merits and the applicability of the AEDPA.[8] Because of the state's failure to raise the abuse of the writ issue before the district judge, we have before us an inadequate record on that question, with no findings of fact or rulings by either the magistrate judge or the district court, no evidentiary basis for any such findings or rulings, no exercise of discretion to review, and no basis on which to make an independent determination ourselves. Because our inability to perform a proper review is a result of the state's failure to object to the magistrate judge's actions, and because the claims counsel raises are colorable, we will treat the abuse of writ issue as waived. We therefore next consider the merits of Turner's petition.I. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL
 
 A. PERFORMANCE
 
 23
 A defendant's representation is constitutionally deficient if it falls "below an objective standard of reasonableness" or "outside the wide range of professionally competent assistance." Strickland v. Washington, 466 U.S. 668, 688, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Our inquiry must be "highly deferential" to the attorney's performance, and we employ "a strong presumption that counsel's conduct falls within [this] wide range." Strickland, 466 U.S. at 689, 104 S.Ct. 2052.
 
 
 24
 The presumption that counsel is effective cannot excuse Smyth's total failure to investigate and prepare a defense to the murder charge. A defense attorney has a general "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691, 104 S.Ct. 2052. See also Harris v. Wood, 64 F.3d 1432, 1435-36 (9th Cir.1995). In this case, as noted by the magistrate judge, "Smyth not only failed to make a reasonable investigation of the events surrounding Dennis's slaying, he made no investigation at all." Moreover, in addition to failing to conduct his own investigation, Smyth did not even bother to review the readily available summary of the investigation conducted by Turner's previous attorney, and therefore could not pursue any leads already developed or assess the value of the information already assembled. This inexplicable failure to do even the most minimal investigation cannot be viewed as a strategic decision. See Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994); United States v. Burrows, 872 F.2d 915, 918 (9th Cir.1989); Evans v. Lewis, 855 F.2d 631, 637 (9th Cir.1988).
 
 
 25
 In addition to his failure to conduct his own investigation or review the results of the public defender's, Smyth did not make any effort to investigate the state's case. This, again, falls below minimum standards of competent representation. See Kimmelman, 477 U.S. at 385, 106 S.Ct. 2574 ("Respondent's lawyer neither investigated, nor made a reasonable decision not to investigate, the State's case through discovery. Such a complete lack of pretrial preparation puts at risk both the defendant's right to an ample opportunity to meet the case of the prosecution and the reliability of the adversarial testing process.") (citations and internal quotation marks omitted). Smyth also failed to interview any of the witnesses that the government planned to call to testify, and therefore could not have known how they would testify and what information he should try to elicit on cross-examination or would otherwise need to present in response. See United States v. Tucker, 716 F.2d 576, 583 (9th Cir.1983) (counsel cannot make "informed assessment" of case without ascertaining how government witnesses will testify).[9]
 
 
 26
 Smyth's failure to arrange a psychiatric examination or utilize available psychiatric information also falls below acceptable performance standards. See Seidel v. Merkle, 146 F.3d 750, 755 (9th Cir.1998) (ineffective performance when "trial counsel failed to conduct any investigation at all into his client's psychiatric history and therefore neglected to pursue a potentially successful defense"), petition for cert filed, 67 U.S.L.W. 3178 (U.S. Sep. 10, 1998)(No. 98-433); Deutscher v. Whitley, 884 F.2d 1152, 1159-60 (9th Cir.1989), vacated on other grounds, 500 U.S. 901, 111 S.Ct. 1678, 114 L.Ed.2d 73 (1991) ("Counsel made no tactical decision not to investigate [the defendant's] possible mental impairment. He simply failed to do so."); Evans, 855 F.2d at 637 ("[C]ounsel's failure to pursue the possibility of establishing [the defendant's] mental instability constituted deficient performance."). See also Bloom v. Calderon, 132 F.3d 1267, 1277 (9th Cir.1997), cert. denied, --- U.S. ----, 118 S.Ct. 1856, 140 L.Ed.2d 1104 (1998). Smyth's failure to investigate and obtain psychiatric corroboration of Turner's defense is especially egregious in this case, given that the entire defense strategy rested on contesting the intent element of the crime, a defense which could have benefited enormously from readily available psychiatric evidence. See Maddox v. Lord, 818 F.2d 1058, 1061-62 (2d Cir.1987) (failure to develop psychiatric testimony to support extreme emotional disturbance defense was ineffective).
 
 
 27
 Of course, Smyth would not have needed to do very much investigation on his own, since Turner's previous attorney had already arranged for a psychiatric examination and obtained what appeared to be a very helpful psychiatric report. Smyth's failure to even read Dr. Davis's psychiatric evaluation--which would have bolstered Turner's heat of passion defense and helped to explain his failure to move out of the rooming house or report the ongoing abuse to the police--was certainly ineffective.
 
 
 28
 Finally, Smyth's failure to adequately consult with and prepare his client to testify did not meet the standard of competent representation. "Adequate consultation between attorney and client is an essential element of competent representation of a criminal defendant." Tucker, 716 F.2d at 581. Counsel's admission that he spent at most forty-five minutes with Turner prior to trial demonstrates deficient performance. Much longer periods of consultation have previously been found ineffective in this circuit. See, e.g., Harris, 64 F.3d at 1436; Tucker, 716 F.2d at 582. Smyth's cursory consultation is especially shocking in light of the seriousness of the charges against Turner, the fact that the entire defense hinged on Turner's intent and mental state, and that Turner testified in a manner that suggests he was wholly unprepared to answer questions on cross-examination.
 
 
 29
 In sum, it would be difficult to imagine a possible explanation for Smyth's complete inaction in this case. His inadequate investigation, consultation, and trial preparation fall far outside the range of reasonable professional assistance. The only question remaining, therefore, is prejudice.
 
 B. PREJUDICE
 
 30
 Even if an attorney's performance is deficient, a defendant is not entitled to relief unless "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. When an attorney has made a series of errors that prevents the proper presentation of a defense, it is appropriate to consider the cumulative impact of the errors in assessing prejudice. See Harris, 64 F.3d at 1438-39 ("By finding cumulative prejudice, we obviate the need to analyze the individual prejudicial effect of each deficiency.").
 
 
 31
 Because Turner admitted commission of the act which resulted in Dennis's death, the only real issue in the case was whether he acted with the requisite willful, premeditated, and deliberate intent; otherwise he could not have been guilty of first degree murder. Turner claims that adequate pretrial preparation and investigation would have produced a different result: conviction of either second degree murder or voluntary manslaughter.[10] This would suffice for a showing of prejudice. Seidel, 146 F.3d at 757; United States v. Palomba, 31 F.3d 1456, 1465 (9th Cir.1994).
 
 
 32
 We therefore face the question whether Smyth's failure to pursue the evidence that Turner now presents--including the psychiatric report and the interviews with lay witnesses--is sufficient to "undermine confidence in the outcome" of his trial. Without an evidentiary hearing before the district court, we cannot determine whether Turner meets this prejudice standard.
 
 
 33
 In other cases, we have found that the failure to adequately investigate or introduce relevant evidence of a defendant's mental state undermined confidence in a defendant's murder conviction. In Bloom v. Calderon, the attorney's failure to assemble psychiatric evidence that the defendant killed his father in an emotional reaction to past abuse, and that he did not reflect or deliberate, was prejudicial despite strong evidence suggesting premeditation. Bloom, 132 F.3d at 1275, 1277-78.[11] See also Seidel, 146 F.3d at 757 (absence of a mental illness defense prejudiced defendant; there was a "reasonable probability" that defendant would have been found guilty of manslaughter rather than murder).
 
 
 34
 In this case there are factors present that suggest that the failure to present psychiatric testimony may have been especially prejudicial. The only evidence presented in Turner's defense was his own trial testimony, rendering his credibility a central issue. The importance of Turner's credibility was further heightened by the prosecutor's emphasis on Turner's failure to present any corroboration of past abuse and on Turner's failure to adequately explain why he didn't leave the boarding house instead of killing his abuser.[12] The content of Dr. Davis's report and his later affidavit would likely have bolstered Turner's testimony by corroborating Turner's heat of passion defense, undermining the prosecution's argument that Turner had the requisite intent for first degree murder, and explaining Turner's failure to move out of the boarding house. The lay witnesses who could have corroborated Dennis's violent behavior and Turner's contemporaneous reports of fear and abuse would similarly have strengthened Turner's credibility.
 
 
 35
 However, the psychiatric report and evidence of statements by lay witnesses are in themselves insufficient to allow a proper determination of whether there was prejudice to Turner. It is unclear from the present record whether Dr. Dennis had access to Turner's conflicting statements and confessions when he made his psychiatric diagnosis. Furthermore, Dr. Dennis's 1990 affidavit does not specify whether he would have offered his explanation for Turner's failure to leave the rooming house at the time of Turner's trial or whether it was based on subsequent developments in his field. Resolution of these questions requires an evidentiary hearing.
 
 
 36
 The district court did not explain why it failed either to find prejudice or to order an evidentiary hearing. It simply stated that although this additional evidence might have made a difference in a trial today, it would not have in 1982. We do not believe this to be an adequate explanation. Apparently, the district court was referring to the fact that the "battered spouse's syndrome" defense was not generally accepted until after the time of Turner's trial. However, this analogy is not necessary to Turner's defense. Even without such colorful terminology to describe Turner's situation, presentation of the psychiatric evidence might very well have had a significant influence on the jury's verdict.
 
 
 37
 When a habeas petitioner alleges facts which, if proven, would entitle him to relief, and he did not receive a full and fair hearing by a state court which found the relevant facts, then he is entitled to an evidentiary hearing in the district court. See Turner v. Marshall, 63 F.3d 807, 815 (9th Cir.1995); Hendricks v. Vasquez, 974 F.2d 1099, 1103 (9th Cir.1992). Because further development of pertinent facts regarding prejudice is required, an evidentiary hearing is appropriate in this case. See Siripongs v. Calderon, 35 F.3d 1308, 1315 (9th Cir.1994); Hendricks, 974 F.2d at 1110; Burrows, 872 F.2d at 919.II. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL
 
 
 38
 The defendant also argues that his lawyer was ineffective for failing to raise on appeal the trial judge's omission of the definitions of "willful," "deliberate," and "premeditated" from the first degree murder instruction. Neither the magistrate judge nor the district judge addressed this claim or explained why they failed to do so. There are two possible explanations for their failure to consider the issue. First, the magistrate judge may have agreed with the state's conclusion that the claim was barred. Second, she may have found it unnecessary to reach the issue since she held that Turner's trial counsel was ineffective, and thus that Turner was entitled to a new trial, rather than simply a new appeal. When granting a defendant the greater relief, it is often not necessary to decide the question whether he is also entitled to the lesser. In any event, Turner's failure to object to the magistrate judge's failure to recommend that the lesser relief be granted is understandable in light of the fact that she recommended the greater. Because, however, we may be faced with another appeal relating to whether Turner is entitled to a new trial, at the time the district court considers the issue discussed in Part I, it shall also either address the instructional error question or explain why such consideration is not warranted.[13]
 
 
 39
 We note that Turner has presented a strong argument on the merits of the instructional error question. First, the deference typically afforded to strategic attorney decisions about which issues to raise on appeal (see Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir.1989)) is not warranted here, since Smyth has admitted that he did no legal research and failed to raise any claims on appeal, instead filing a Wende no-merit brief. Second, the fact that the instructional error provided a meritorious ground for appeal should have been obvious to Smyth. The trial record reveals that the judge skipped the page of the California first degree murder jury instruction that defined the most essential terms. The effect was that the instruction conflated the definitions of first and second degree murder by suggesting that a finding of malice aforethought required conviction of first degree murder.[14] Such an instructional error probably would have required reversal under then existing California law.[15]
 
 CONCLUSION
 
 40
 The deficient performance of Turner's attorney is clear on the current record. Turner has also made a sufficient showing of prejudice to warrant a remand for an evidentiary hearing. We therefore reverse the district court's denial of Turner's petition and remand for proceedings consistent with this opinion.
 
 
 41
 REVERSED AND REMANDED.
 
 
 
 [1]
 There was conflicting testimony regarding whether and when Turner made this threat. During his preliminary hearing testimony, Berry stated that Turner had made the threat just prior to setting Dennis on fire. At trial, however, Berry initially testified that Turner had made the statement the day before the killing. When confronted on cross-examination with the apparent inconsistency, Berry then said that Turner had made the statement on both occasions. Ross, who was also in the room with Turner and Berry immediately prior to the crime, testified at trial that he did not hear Turner make the threat
 
 
 [2]
 Turner contends that Dennis was not asleep, but was lying on the floor and, as Turner walked through the living room, took out his penis and said "he would be up to the room later that night."
 
 
 [3]
 In these statements, Turner alternately denied setting Dennis on fire (and stated that he had purchased gasoline to clean rust from his floor), acknowledged some involvement and prior planning (sometimes also claiming that others had conspired with him), and admitted to setting Dennis on fire (and, in this version, stated that he purchased the gasoline because he could not afford a gun). He also expressed his hatred of Dennis and his hope that Dennis would die, and stated that he had in the past been raped and attacked by him
 
 
 [4]
 In a later declaration, Dr. Davis elaborated on his conclusions: "I believe that [petitioner's] situation was similar to that of a battered spouse. A man who is, by force, sodomized is demasculinized and loses his self respect. I believe this is how [petitioner] felt." He further explained that Turner "may have felt incapable of leaving his boarding house, in part, because of fear of Dennis." His declaration does not specify whether he would have testified to this effect in 1982
 
 
 [5]
 Turner did not contend that Dennis had used any weapon to subdue him, though he did state that Dennis was "a muscular individual, skilled at 'karate sticks,' who the petitioner was physically unable to resist." Dennis was six feet tall, 180 pounds and muscular, while Turner was five foot five inches and 111 pounds
 
 
 [6]
 The first degree murder instruction was incorrect; the judge erroneously omitted the definitions of the terms "willful," "deliberate," and "premeditated." Turner's attorney did not object to the omission
 
 
 [7]
 The district court did find that, while "far from exceptional," defense counsel's performance in front of the jury was reasonable. However, counsel's complete failure to prepare for trial invariably tainted his ability to render an adequate trial performance. Cf. Kimmelman v. Morrison, 477 U.S. 365, 385-86, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)
 
 
 [8]
 Because the magistrate judge had recommended granting the writ, Turner was the prevailing party, and the state was obligated to raise all of its objections. A different case may be presented when a magistrate or district judge rules for a party on one dispositive issue and therefore fails to reach other issues in the case
 
 
 [9]
 Although Tucker was decided before Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the standard for reviewing a counsel's performance in the Ninth Circuit was essentially the same as the standard later adopted by the Supreme Court: "representation of an accused must be within the range of competence generally demanded of attorneys in criminal cases." Tucker, 716 F.2d at 579
 
 
 [10]
 At the time of Turner's trial, California state defined first degree murder as a willful, deliberate and premeditated killing with express malice aforethought. CALJIC No. 8.20 (1979). Second degree murder was defined as an unlawful killing with malice aforethought but without deliberation and premeditation. CALJIC No. 8.30 (1979). Voluntary manslaughter was an unlawful killing with intent to kill but without malice aforethought. "There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion." CALJIC 8.40 (1979)
 
 
 [11]
 For another case in which failure to investigate and present psychiatric evidence was prejudicial despite strong evidence of premeditation, see Maddox, 818 F.2d at 1060-61
 
 
 [12]
 A prosecutor's emphasis on the defendant's failure to corroborate key facts is a relevant consideration in the prejudice inquiry. See Deutscher, 884 F.2d at 1160 (prosecutor pointed out defendant's failure to introduce psychiatric testimony supporting insanity claim); Tucker, 716 F.2d at 583-84 (prosecutor emphasized in his closing argument that no witnesses corroborated defendant's version of events)
 
 
 [13]
 There is no apparent explanation for why Turner does not raise the failure to object to the erroneous jury instructions as a trial error demonstrating the ineffectiveness of trial counsel. If it was deficient performance to fail to raise the issue on appeal, then it would also appear to be deficient performance to fail to object when the instruction was proposed or given--and ineffectiveness of trial counsel could entitle Turner to have his conviction overturned, rather than just a new state appeal. However, if the error was sufficiently prejudicial to entitle Turner to have his conviction overturned, then the result of raising deficient performance at either stage of the proceedings would likely be the same in the long run
 
 
 [14]
 The order in which the instructions were given exacerbated this problem. The trial judge read the incomplete instruction for first degree murder immediately after the jury instruction defining malice aforethought, without any separation, suggesting that a finding of malice fulfilled the intent requirement for first degree murder
 
 
 [15]
 See People v. Thomas, 25 Cal.2d 880, 898-902, 156 P.2d 7, 17-19 (Cal.1945) (jury instruction which failed to define "willful, deliberate and premeditated" and suggested that first degree murder required only specific intent to kill required reversal). Although there were two other bases upon which the jury could have convicted Turner of first degree murder, the jury did not specify the theory upon which it relied. Therefore, a legal error in the instructions given for any one theory would have required reversal. See People v. Green, 27 Cal.3d 1, 69, 609 P.2d 468, 510, 164 Cal.Rptr. 1, 43 (Cal.1980), overruled on other grounds, People v. Hall, 41 Cal.3d 826, 834 n. 3, 718 P.2d 99, 104 n. 3, 226 Cal.Rptr. 112, 117 n. 3 (Cal.1986)