# FILE
**IN CLERKS OFFICE**
**SUPREME COURT, STATE OF WASHINGTON**
DATE **MAY 0 8 2014**

*Madsen C.J.*

**CHIEF JUSTICE**

This opinion was filed for record
at 8:00 am on May 8, 2014

*Shon A. Carter Deputy*
for Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint of | No. 86711-9 |
| MARIBEL GOMEZ, | En Banc |
| Petitioner. | Filed May 8, 2014 |

J.M. JOHNSON, J.*—It is difficult to imagine a child more vulnerable than Rafael Arechiga-Gomez, who came into this world drug-addicted. The State system designed to safeguard vulnerable children did not save Rafael. His short life was punctuated by severe and continual abuse at the hands of his own mother, Maribel Gomez. During the brief periods of time that he was in his mother's care, Rafael endured a broken right tibia, bruises, lacerations to his nipples, a broken left femur, an occipital skull fracture, pinched ears, an infected scab injury to the back of his skull, burns on his left hand, burns on

---

* Justice James M. Johnson is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

his tongue, at least one other skull fracture, an impact injury to his forehead, fractures to both upper arms, and the fatal blow to his head that ended his life at only 25 months.

This case arises from the legal defense of Maribel Gomez against charges of manslaughter and homicide by abuse for the death of her son. The question is one of ineffective assistance of counsel under the Sixth Amendment to the United States Constitution.

Gomez has not met her burden of proving ineffective assistance of counsel. The trial court transcripts paint a picture of a supremely fair trial at which Gomez was represented by a highly competent attorney. Having received a fair trial with effective attorney assistance, the State was able to prove all elements of homicide by abuse. We accordingly deny her personal restraint petition.

## ISSUES

I. Did Gomez receive counsel free of conflicts of interest?

II. Did Gomez receive effective assistance of counsel?

## FACTS

Gomez gave birth to Rafael on August 7, 2001, in the backseat of her car. He was taken to the hospital, where he tested positive for

methamphetamine, cocaine, and other nonprescribed controlled substances as a result of her drug use during pregnancy. Rafael was placed in foster care and was later declared a dependent of the State of Washington. In the 10 months he was in foster care from August 10, 2001, through June 4, 2002, Rafael did not sustain any significant injuries. At the time he was placed in Gomez's custody, Rafael was an "easy" baby who could feed himself.

In September 2002, three months after leaving foster care and returning to his biological family, Rafael was taken to Samaritan Hospital for a fractured right tibia. He also had numerous bruises on his abdomen and back in the shape of a hand print. The following day, the physician's assistant who casted Rafael's leg noticed lacerations on both of his nipples.

In early December 2002, less than three months after his broken tibia, Rafael was taken to Quincy Valley Medical Center for a broken left femur. He was then transferred to Central Washington Hospital, where Gomez falsely reported a history of a normal pregnancy and reported no prior hospitalizations. In addition to the proximal femur fracture, he was diagnosed with an occipital skull fracture, a pinch mark bruise to his ear, an infected scab injury to the occipital bone at the back of the skull, burns on his left hand, and a burn on his tongue. When the x-rays were reviewed, an additional skull

fracture was noted that was in the early stages of healing. More than one physician had concerns of abuse, and Child Protective Services (CPS) was contacted. One treating physician, Dr. Cook, "had no doubt that Rafael had been physically abused." Finding of Fact (FF) 2.17. Rafael was returned to his foster family, where he again sustained no serious injuries.

Rafael was returned to Gomez three months later on March 21, 2003. Gomez testified that Rafael rolled off the bed and hit his forehead about a week before his death. She testified that she took him to CPS to show the injury to her case worker, Murray Twelves, and his supervisor, Cecelia DeLuna. Mr. Twelves and Ms. DeLuna both testified that Gomez never brought Rafael in to CPS to show them his injury.

On September 9, 2003, less than six months after being returned to Gomez's care for the final time, the events occurred that led to Rafael's death. Gomez testified that she was feeding soup to Rafael when he threw himself backwards in a tantrum with a mouth full of soup. According to Gomez, Rafael hit his head on the floor, lost consciousness, and died the next day. Rafael was declared dead on September 10, 2003, at approximately 25 months old. An autopsy was performed one day after his death. The autopsy indicated blunt force injuries of the head to include

abrasions of the face, right ear, and scalp; subgaleal hemorrhages of the occipital scalp and supragaleal hemorrhage of the frontal scalp, acute and subacute; occipital skull fractures, acute and chronic, focal organizing epidural hemorrhage; acute subdural and subarachnoid hemorrhages; cerebral edema; and focal acute ischemic changes of the cerebrum. The autopsy further revealed bilateral retinal hemorrhages, contusions of the back and upper extremities, and periosteal and epiphyseal-metaphyseal injuries of the proximal humeri. The injuries showed variably acute to subacute and chronic features. The features of the skull fractures suggested acute/recent fractures superimposed on an area of previous skull injury. *Dr. Ross' autopsy findings were consistent with non-accidental trauma. Based on the autopsy findings and the investigative history, Dr. Ross concluded that Rafael died as a result of blunt force injuries of the head. He indicated that the manner of death was homicide.*

FF 2.33 (emphasis added).

The autopsy revealed multiple skull fractures of varying ages, as well as new injuries that had not been noted while Rafael was alive. These new injuries included breaks to his upper arms. Dr. Feldman testified that this occurred when Rafael's arms were jerked severely enough to separate the bones at the shoulders. Although Gomez testified that Rafael exhibited self-injurious behaviors, the foster mother, the day care provider, and the case worker all testified that they had never observed such behavior.

Rafael's death in Gomez's presence gave rise to dependency proceedings in 2004 and 2006 to determine the status of the other children of

Gomez and Jose Arechiga, Rafael's father. During the 2004 proceedings, both Gomez and Arechiga argued that Rafael's injuries resulted from accidents or Rafael's odd behavior. During the dependency proceedings, Robert Moser, a local defense attorney, represented Arechiga and another attorney represented Gomez.

Around the time of the 2004 proceedings, the State charged Gomez with manslaughter. Instead of having her attorney at the dependency proceedings defend her against the manslaughter charge, Gomez retained Arechiga's attorney, Moser. Moser's experience included trying misdemeanors as a district court deputy prosecutor and practicing criminal and tort law privately.

When Moser began representing Gomez, he based his investigation of her case on the facts and impressions he gathered from the 2004 proceedings. At the proceedings he heard testimony from friends, neighbors, social workers, and doctors who had seen Rafael while he was alive or after his death and who had reviewed his medical records for CPS. Such testimony led him to believe that Gomez's argument about accidents and self-injury would not persuade a judge or jury. Moser states, however, that when he learned new information from Gomez concerning this argument, he endeavored to

interview new witnesses. Because Gomez speaks Spanish and, as Moser admits, her English skills are "not very good," App. 4, at 4,[1] the two sometimes spoke through a bilingual friend of Gomez's or a court interpreter.

In addition to investigating lay witnesses, Moser sought out expert witnesses to opine on the cause of Rafael's death. Moser's theory of the case appears to have been that Rafael's death was not due to his fall while eating soup the day before his death, but rather a fall he took from a bed and onto his head a few days prior. Moser eventually retained Dr. Janice Ophoven, a forensic pathologist who specializes in diagnosing the cause of child injuries and deaths, to opine on the cause of Rafael's death.

Dr. Ophoven requested autopsy slides and radiology images from Moser, but Moser did not fulfill her request until around the start of trial. He did, however, write to Dr. Ophoven to provide her with background information, including that Rafael had suffered many injuries that were "suspicious for child abuse." App. 18, at 2. Dr. Ophoven misunderstood Moser's letter to mean that CPS had confirmed the history of abuse.

---

[1] All appendix citations are to the appendices attached to the amended opening brief of petitioner.

At trial, Dr. Ophoven testified that Rafael died of aspiration pneumonia (choking) and conceded that Rafael had been abused. Her ultimate conclusion was that the cause of death was undetermined. The trial judge concluded that Rafael died of blunt force trauma and that Gomez caused his death. The trial judge also concluded that the upper arm injury, occipital skull fracture and epidural hemorrhage, bruised/gouged ear injuries, and lacerated nipples were all the result of assaults by Gomez. She was convicted of manslaughter and homicide by abuse.

On appeal, the manslaughter conviction was vacated on double jeopardy grounds. *State v. Gomez*, noted at 147 Wn. App. 1003, 2008 WL 4561499. Gomez then filed a personal restraint petition, which was denied by the Court of Appeals. *In re Pers. Restraint of Gomez*, noted at 164 Wn. App. 1017, 2011 WL 4839109. Petitioner then filed a motion for discretionary review before this court, which was granted. *In re Pers. Restraint of Gomez*, 175 Wn.2d 1005, 284 P.3d 742 (2012).

STANDARD OF REVIEW

To prevail on a collateral attack on a judgment and sentence by way of a personal restraint petition, a petitioner must generally first establish that a constitutional error has occurred and it has resulted in actual and substantial

8

prejudice or that a nonconstitutional error has caused a complete miscarriage of justice. *In re Pers. Restraint of Grantham*, 168 Wn.2d 204, 212, 227 P.3d 285 (2010) (quoting *In re Pers. Restraint of Isadore*, 151 Wn.2d 294, 298, 88 P.3d 390 (2004)). However, "if a personal restraint petitioner makes a successful ineffective assistance of counsel claim, he has necessarily met his burden to show actual and substantial prejudice." *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012). An appellate court will review a claim of ineffective assistance of counsel de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009) (citing *In re Pers. Restraint of Fleming*, 142 Wn.2d 853, 865, 16 P.3d 610 (2001)).

In order for a petitioner to prevail on an ineffective assistance claim, she must overcome the presumption that her counsel was effective. *State v. Thiefault*, 160 Wn.2d 409, 414, 158 P.3d 580 (2007). To do this, she must demonstrate that "(1) 'counsel's representation fell below an objective standard of reasonableness' and (2) 'the deficient performance prejudiced the defense.'" *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 35, 296 P.3d 872 (2013) (quoting *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Accordingly, to prevail on her claim, Gomez must first prove that Moser's "acts or omissions were outside the wide range

of professionally competent assistance." *Strickland*, 466 U.S. at 690. She must then demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The United States Supreme Court has indicated that we must be highly deferential to counsel's performance. *Id.* at 689. Consequently, we must "recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

ANALYSIS

A.     Conflicts of Interest

Gomez claims that Moser's representation of her at trial and of Arechiga at the dependency proceedings created a conflict of interest that violated her right to effective assistance of counsel. Defense counsel has a duty of loyalty to the defendant, and thus the right to effective assistance of counsel includes the right to conflict-free counsel. *Id.* at 692. But a conflict of interest is not a per se violation of the right. *See Holloway v. Arkansas*, 435 U.S. 475, 482, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978) (stating that joint

representation of codefendants is not a per se violation of the Sixth Amendment). To show a violation of her right, a defendant must show that (a) defense counsel "actively represented conflicting interests" and (b) the "actual conflict of interest adversely affected" his performance. *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980). Possible or theoretical conflicts of interest are "insufficient to impugn a criminal conviction." *Id.* If the defendant makes both showings as to the alleged conflict of interest, then the court presumes prejudice and the defendant proves her claim. *Id.* at 349-50. Accordingly, we first consider whether Moser actively represented conflicting interests. We conclude that he did not.

Gomez argues that Moser actively represented conflicting interests because he violated the Rules of Professional Conduct (RPCs) regarding conflicts of interest. However, the RPCs do not "embody the constitutional standard for effective assistance of counsel." *State v. White*, 80 Wn. App. 406, 412-13, 907 P.2d 310 (1995) (stating the rule in the direct appeal context). Rather, they serve as mere guides for determining what is reasonable. *See Strickland*, 466 U.S. at 688-89. Taking the RPCs as a guide, we note that the RPCs provide that a concurrent conflict of interest exists if

"the representation of one client will be directly adverse to another client" or "there is a significant risk that the representation of one . . . client[ ] will be materially limited by the lawyer's responsibilities to another client." RPC 1.7(a)(1), (2).

Here, the record shows that at most there was a theoretical conflict of interest between Gomez and Arechiga. At the 2004 dependency proceedings, Gomez and Arechiga were not adverse because they both countered the State's position that they were neglectful or abusive by arguing that they were neither and that Rafael's injuries were caused by accident or his own behavior. From the time the State charged Gomez with manslaughter (May 2004) to the time the State added the charge of homicide by abuse (April 2006), Gomez and Arechiga were not adverse because the only charge was manslaughter and Arechiga was not present when Rafael was fatally injured. Thus, Arechiga was not a suspect. From the time the State added the charge of homicide by abuse (April 2006) through Gomez's criminal trial (March 2007), Gomez and Arechiga were potentially adverse because Gomez could have theoretically argued that Arechiga was responsible for some or all of the abuse of Rafael and thereby escaped a conviction for homicide by abuse.

Although Gomez and Arechiga were potentially adverse from April 2006 through March 2007, ample evidence shows they were not actually adverse because Gomez could not have reasonably argued that Arechiga abused Rafael. First, the trial judge found that Gomez was the sole caretaker of Rafael when she had custody of him. Second, the trial judge found that Arechiga treated Rafael kindly and heard no evidence that Arechiga abused Rafael or harbored ill will toward him. In her petition, Gomez does not allege new evidence of abuse by Arechiga. Finally, at trial Arechiga supported Gomez's theory and testimony that Rafael's past injuries were caused by accident or behavior.

In sum, the record contains no evidence suggesting that Arechiga abused Rafael and, at trial, Arechiga supported Gomez's defense. It follows that Gomez's allegation of a conflict of interest is merely theoretical, which is "insufficient to impugn a criminal conviction." *Cuyler*, 446 U.S. at 350. Since Gomez has not shown that Moser actively represented conflicting interests, we do not proceed to determine whether his performance was adversely affected by conflicting interests.

B.      Ineffective Assistance of Counsel

To prove a claim of ineffective assistance of counsel, a defendant must show that defense counsel's performance was (a) deficient and (b) prejudicial. *Strickland*, 466 U.S. at 687. We conclude that Moser's defense was not deficient. Accordingly, Gomez received effective assistance of counsel for the purposes of the Sixth Amendment.

The Sixth Amendment standard for effective assistance is "reasonably effective assistance." *Id.* To prove that defense counsel's performance was deficient, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Gomez argues that Moser's performance was deficient with regard to (1) experience, (2) use of interpreters, (3) investigation of lay witnesses, (4) investigation of expert witnesses, (5) preparation of Gomez for trial, and (6) preparation of Ophoven for trial. We conclude that Moser's performance in all six categories met or exceeded the reasonably effective assistance threshold.

1.      *Experience*

Gomez argues that Moser's experience fell below an objective standard of reasonableness because he failed to meet the Washington Defender Association's *Standards for Public Defense Services* (1989) (endorsed by

14

Wash. State Bar Ass'n Bd. of Governors Jan. 1990), *available at* http://www.defensenet.org/resources/publications-1/wda-standards-for-indigent-defense.[2] Prevailing professional standards may serve as guides for determining what is reasonable but may not serve as a checklist for evaluating attorney performance.[3] *Strickland*, 466 U.S. at 688-89.

Standard 14 provides that to represent a defendant accused of a class A felony, public defense counsel must meet the following: (1) Washington's minimum requirements for practicing law as defined by the supreme court; (2) seven hours of legal education per calendar year in a relevant area of law; and (3) either (a) two years of service as a prosecutor, or (b) two years of service as a public defender, or (c) appeared as trial counsel alone or with other trial counsel and handled a significant portion of the trial in three felony cases that have been submitted to a jury. STANDARDS FOR PUBLIC DEFENSE SERVICES std. 14.

---

[2] Gomez submits two other professional standards: Washington State Bar Ass'n, *Standards for Indigent Defense Services* std. 14 (2007), http://www.nlada.net/sites/default/files/wa_wsbastandardsforindigdefense_09202007.pdf, and the Washington State Supreme Court *Standards for Indigent Defense* std. 14.2 (2012). Because these standards were not in effect at the time of trial, we do not rely on them to evaluate Moser's experience. *See Strickland*, 466 U.S. at 689.

[3] This court has previously concluded that "professional standards are evidence of what should be done, no more." *State v. A.N.J.*, 168 Wn.2d 91, 113, 225 P.3d 956 (2010).

Setting aside the fact that Moser was not a public defender at the time of trial, it appears he met this prevailing standard for public defenders when he took Gomez's case in May 2004. By that time, he held a license to practice law in Washington, had served as a district court deputy prosecutor for 20 months, and had worked in private practice on criminal and tort matters for just under 12 months. The only evidence showing that Moser did not meet the legal education requirement is his statement that he did not seek additional training while representing Gomez. Gomez makes no showing that Moser did not actually meet the education requirements or that his relevant experience was less than two years. In sum, Moser's experience roughly met the prevailing professional standard in effect at the time of trial, which suggests he had sufficient experience to defend Gomez.

In addition to prevailing professional standards, Gomez submits the opinions of a seasoned defense attorney and a law professor on what experience a lawyer would need to try Gomez's case. Garth Dano, a Grant County criminal defense lawyer, stated that Gomez's case would take 200 to 1,000 hours to execute, a standard Moser met because he put an estimated 500 hours into Gomez's case.

Professor John Strait of Seattle University School of Law stated that Moser was insufficiently experienced because he had no experience with causation issues or expert opinion on child abuse. Yet, the record suggests that Moser had experience with causation issues from his public service and private practice work, as well as experience with medical experts, psychologists, social workers, and guardians ad litem. In sum, Moser appears to have met the prevailing professional standard, met Dano's time requirement, and met Strait's causation requirement. Accordingly, we conclude that Gomez has not proved that Moser's experience was deficient.

2.    *Use of Interpreters*

Ms. Gomez claims that she was denied her constitutional right to effective assistance of counsel because her attorney, Moser, failed to adequately consult with her through an interpreter. To support this claim, she relies on her own declaration as well as a declaration from Moser. Both declarations were drafted in May 2010, approximately six years after Moser began representing Gomez. Moser's declaration indicates that for the most part, he cannot remember whether he was using an interpreter while discussing specific issues with Gomez. Although they did communicate without an interpreter on some occasions, they also used court interpreters or

friends of Gomez's. Moser even retained a court certified interpreter to interpret during three interviews he held with Gomez in jail during her trial. The burden is on Gomez to show that Moser's use of interpreters was deficient and ultimately prejudiced her at trial. Gomez has not met this burden.

Prior to her personal restraint petition, Gomez never informed anyone of any ongoing problems communicating with her attorney. Despite being in court on numerous occasions during the three years pending trial—during which she was assisted by a court certified interpreter—she cannot point to a single instance where she complained about an inability to meaningfully communicate with Moser. Gomez neither raised this issue during her trial nor on appeal.

The trial transcript also indicates that both Moser and Judge Antosz respected Gomez's use of interpreters, ensuring that she fully understood the proceedings. For example, at trial, Moser communicated to the court that Gomez had expressed a concern about one of the court interpreters. Specifically, she felt that this interpreter may have missed a few words because he was looking down during part of the testimony. Judge Antosz took this very seriously and questioned Gomez to ensure she had understood all the proceedings. The court also granted another request Gomez made to recuse a

different court interpreter who had a potential conflict of interest. These incidents bring to light two key points. First, both Moser and Judge Antosz understood and respected the critical role of interpreters to Gomez's trial. Second, Gomez was capable of speaking up when she believed problems existed with communication.

Even if Moser's use of interpreters was deficient, Gomez has not shown that she was prejudiced. Her version of the facts and defenses presented in her personal restraint petition are materially identical to those presented at trial. Despite the alleged communication problems she attributes to Moser's deficient representation, she has not pointed to where she would have said or done anything differently had the alleged miscommunication been addressed. In fact, she testified on her own behalf at trial, according the judge the opportunity to hear firsthand her own account of Rafael's injuries and the events leading to his death.

Gomez relies on *Chacon v. Wood*, 36 F.3d 1459, 1464-65 (9th Cir. 1994), for the proposition that effective assistance of counsel requires complete translation for non-English speaking defendants. Such reliance is misplaced. In *Chacon*, the defendant claimed that he was grossly misinformed of the sentencing consequences of his plea when an interpreter

mistranslated defense counsel's explanations. *Id.* at 1461. This led to the defendant pleading guilty to an offense that he believed would be punishable by 3 months in jail, but he was sentenced to up to 10 years in prison. *Id.* at 1460-61.

*Chacon* is inapposite because, here, there are no allegations that there was improper translation of any significant discussions between Moser and Gomez. We find no fault with Gomez and Moser's discussions on trial rights, the right to a jury trial, or her right not to testify. Gomez fails to meet her burden of proof that Moser's use of interpreters was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. She also has not shown how any alleged deficiencies prejudiced her at trial.

### 3. *Investigation of Lay Witnesses*

Gomez argues that Moser's investigation fell below an objective standard of reasonableness because he failed to find certain lay witnesses. Defense "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.* "For example, when the facts that support a certain potential line of defense

are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." *Id.*

Here, Moser states that he got most of his facts from the dependency proceedings and only a few new facts from Gomez herself. After the start of trial, Gomez suggested that Moser call her friends to testify, but Moser chose not to do so because he had heard them testify at the dependency proceedings, considered them mere character witnesses, and thought they could not testify to specific facts related to Rafael's death or injuries. Moser also chose to make a limited investigation of CPS workers because he had heard some of them testify at the dependency proceedings and did not think any of them had actually seen Rafael's allegedly odd behaviors. Nonetheless, when Gomez suggested that Moser contact Graciela Alvarado, a CPS worker, Moser made numerous attempts to interview her and even tried to subpoena her but to no avail.

All of these facts suggest that Moser was generally aware of the facts and witnesses that supported Gomez's argument that Rafael's injuries resulted from accidents or his odd behaviors. His choice not to develop this argument

was correspondingly reasonable. Thus, we conclude that Moser made an objectively reasonable investigation of lay witnesses.

4.      *Investigation of Expert Witnesses*

At trial, Moser presented one expert witness for the defense, Dr. Janice Ophoven. She testified that Rafael died from asphyxiation. Gomez claims that Moser was ineffective for failing to consult with more expert witnesses who could have presented a more thorough defense. The record simply does not support this contention.

As noted, the *Strickland* standard for ineffective assistance of counsel provides a high level of deference to trial counsel's strategic decisions. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* Given this deference, Gomez has not proved that Moser's investigation of experts was deficient and has not shown that she was prejudiced by such alleged deficiencies.

Moser pursued six or seven different experts, particularly in the area of pediatric forensic pathology and epilepsy. He was able to secure the services of Dr. Ophoven. He also specifically pursued Dr. May Griebel at the University of Arkansas. His declaration states that he sent her materials, but

she returned them, saying she was unable to complete a review. Moser had difficulty obtaining a local expert to work on the case because many had potential conflicts with Dr. Feldman, one of the State's experts. Even after securing Dr. Ophoven, Moser continued to try and secure additional experts, sending them relevant materials for review. In the end, only Dr. Ophoven was willing or able to assist with an opinion consistent with the defense's view of events.

Moser contacted multiple experts and secured one to explain Rafael's death. He was not required to search the entire country for experts, finding multiple witnesses who could provide the most favorable opinion for the defense. Given the great deference afforded investigative decisions under the *Strickland* standard, Gomez has not met her burden of proving that Moser's investigation of experts was deficient. Furthermore, a thorough review of the trial transcript reveals that Dr. Ophoven provided adequate testimony that generally supported the defense's theory of the case. For this reason, Gomez has not shown that Moser's alleged deficiency in investigating experts prejudiced her at trial.

5.   *Preparation of Gomez for Trial*

Gomez argues that Moser's preparation of her for trial fell below an objective standard of reasonableness because he did not inform her of the nature of trial proceedings, nor did he prepare her for direct or cross-examination. Gomez cites *Turner v. Duncan*, 158 F.3d 449 (9th Cir. 1998), for the proposition that defense counsel has a duty to prepare a defendant to testify. In *Turner*, the Ninth Circuit found that defense counsel's "admission that he spent at most forty-five minutes with [the defendant] prior to trial demonstrates deficient performance." *Id*. at 457. *Turner* is inapposite to this case, however, because Moser makes no such admission. To the contrary, he states that he knows they discussed Gomez's testimony several times but does not remember the specifics of their preparation. Thus, *Turner* does not show that Moser's preparation of Gomez for trial was objectively unreasonable.

In addition, the record shows that prior to trial Gomez experienced court and trial-like proceedings on multiple occasions and in Moser's presence. For instance, she spent four days in dependency proceedings in 2004 and sat in court with the aid of an interpreter on at least eight occasions prior to trial. While this evidence does not show that Moser fulfilled his duty to prepare Gomez for trial, it does show that Gomez was in fact informed of

the nature of trial proceedings before going to trial. Since she does not meet her burden of proof, we conclude that Moser's preparation of Gomez for trial did not fall below an objective standard of reasonableness.

6.      *Preparation of Dr. Ophoven for Trial*

Gomez finally argues that Moser's trial preparation of Dr. Ophoven fell below an objective standard of reasonableness because he failed to provide her with necessary medical records on time and inform her of the elements of homicide by abuse. Gomez's complaints about Moser's preparation of Dr. Ophoven appear to fall into two categories: (a) Moser's general preparation of Dr. Ophoven for trial and (b) Moser's alleged failure to prevent Dr. Ophoven from "conceding" abuse at trial. Both are unfounded.

a.      Moser's General Preparation of Dr. Ophoven for Trial

Gomez claims that her trial was prejudiced because her expert, Dr. Ophoven, believed that CPS had confirmed a history of abuse when in fact CPS had investigated but never confirmed the allegations. This is based on Dr. Ophoven's declaration that reads in part, "Given what I understood to be confirmed prior physical abuse resulting in longstanding CPS involvement, I gave the manner of death as 'undetermined.' Without the prior abuse, I would have classified the manner of death as 'natural.'" App. 58, at 4. Gomez reads

this to mean that Dr. Ophoven would have concluded that the cause of death was natural had she known that abuse was never officially confirmed by CPS.

This interpretation is reaching and disregards much of the trial record and other portions of Dr. Ophoven's declaration. For example, one paragraph earlier, Dr. Ophoven declared that "[d]espite the history of abuse, this was a relatively straightforward asphyxiation case." *Id.* at 3. This indicates that Dr. Ophoven recognizes the history of abuse in this case. Consequently, Gomez's reading of her previous statement is inconsistent with the record. Instead, the only reasonable interpretation of her statement is this: had the records indicated no prior abuse, she could have testified that the death was natural. However, Dr. Ophoven testified at trial that the medical records *did* reflect abuse. Dr. Ophoven's report indicates that she noted abuse based on "[t]his constellation of traumatic injuries"—not the CPS reports. App. 19, at 8. Accordingly, we have no reason to believe that Dr. Ophoven would testify any differently today than she did in 2007. This is especially clear given that her testimony at trial regarding abuse was based almost entirely on her review of the medical records such as histological slides and x-rays rather than CPS reports. This confirms that even if Moser was at fault for Dr. Ophoven's misunderstanding about the history of abuse, Gomez cannot prove prejudice.

Gomez also contends that Moser's preparation of Dr. Ophoven was deficient because he did not provide her with materials in a timely fashion. However, a thorough review of the trial record does not support such a conclusion. Even if Moser's preparation of Dr. Ophoven was deficient, Gomez cannot show prejudice. By the time of her testimony, Dr. Ophoven had received all the necessary material, created a full report, and provided adequate medical testimony on behalf of the defendant.

In support of the proposition that Moser's preparation of Dr. Ophoven was deficient, Gomez quotes *Bloom v. Calderon*, 132 F.3d 1267, 1278 (9th Cir. 1997): "Where defense counsel's only expert 'requests relevant information which is readily available, counsel inexplicably does not even attempt to provide it, and counsel then presents the expert's flawed testimony at trial, counsel's performance is deficient.'" Am. Opening Br. of Pet'r at 67.

*Bloom* is readily distinguishable from this case. In *Bloom*, the court found ineffective assistance of counsel where the defense attorney did "virtually nothing" to obtain an expert witness until a few days before trial. *Bloom*, 132 F.3d at 1271. In fact, counsel failed to contact the expert or file the court paperwork appointing him as a witness. This was discovered less than three weeks before trial by a law student working with counsel. *Id.*

27

Counsel then did almost nothing to prepare the witness. The expert was never given a theory of the case or the materials he needed. In fact, there was significant evidence readily available to trial counsel, such as previous psychiatric reports, which was never discovered or given to the expert. *Id.* at 1274. The result was a "severely damaging" psychiatric report that the prosecution used against Bloom. *Id.* at 1271.

The Ninth Circuit has since distinguished *Bloom* in a case much more akin to this one. In *Raley v. Ylst*, 470 F.3d 792 (9th Cir. 2006), the court rejected a claim of ineffective assistance of counsel as to the guilt phase of a murder trial where defense counsel conducted a reasonable investigation and made a reasonable, strategic decision not to present expert testimony regarding a mental defect claim. Counsel had consulted three different mental health experts and determined that their testimony would not be beneficial to the defendant. The court also rejected the petitioner's claim that defense counsel failed to provide the experts with enough information about his childhood to support an informed expert opinion. *Id.* at 801.

Here, Moser originally contacted Dr. Ophoven in June of 2005, nearly two years before trial. Moser provided the bulk of material to Dr. Ophoven in January 2006, over a year before trial. Although Dr. Ophoven may have

received some materials such as histological slides inconveniently close to her testimony, she was able to review them, write a complete report, and provide adequate testimony on behalf of the defendant. Accordingly, Moser's alleged failure to provide materials in a timely fashion does not constitute ineffective assistance.

b. <u>Moser's Alleged Failure To Prevent Dr. Ophoven from "Conceding" Abuse at Trial</u>

Gomez claims that Moser failed to discover and correct Dr. Ophoven's misunderstanding regarding the question of abuse. This supposedly led to Dr. Ophoven conceding that Rafael was an abused child at trial. Gomez is unable to prove that Moser deficiently prepared Dr. Ophoven for several reasons. Even if Moser failed to correct Dr. Ophoven's misunderstanding that the history of abuse had been officially confirmed by CPS, it in no way prejudiced Gomez's defense. Dr. Ophoven's passing references to abuse were most certainly warranted given the record that she reviewed. These references to abuse were de minimis amid her medical opinions, as well as in light of the testimony of many other witnesses. Most importantly, Gomez errs when she contends that Dr. Ophoven conceded an element of the crime. This assertion is a misstatement of the law. Abuse is not an element of homicide by abuse.

At trial, Dr. Ophoven testified under oath that she detected a pattern of abuse when she reviewed the records. This testimony could not have prejudiced Gomez given that abuse is not an element of the crime of homicide by abuse. In explaining what she meant by "abuse," Dr. Ophoven testified that it is "[a] child that's been hurt by their caregivers in a context of what I would consider to be inappropriate or criminal behavior. But I can't say who. I just said somebody has been hurting the child." 11 Verbatim Report of Proceedings (VRP) (Mar. 5, 2007) at 2317. She then testified that her definition of "abuse" is broad enough to include neglect. Notably, Moser made it abundantly clear in closing argument that the defense did not concede the perpetration of either assault or abuse by Gomez.

It is true that Dr. Ophoven testified that she detected a pattern of abuse when reviewing the records in preparation for trial. She further testified that her definition of "abuse" is broad enough to include neglect. However, she did not testify that she noted a pattern of assaults or torture. Under the homicide by abuse statute, the relevant element of the crime is just that: "a pattern or practice of assault or torture." RCW 9A.32.055(1). It is indisputable that assault is distinct from abuse under Washington law. *See* RCW 26.44.020(1) (defining "abuse or neglect"); *c.f.* RCW 9A.36.011-.041

(defining assault in the first, second, third, and fourth degrees); RCW 9A.36.120-.140 (defining assault of a child in the first, second, and third degrees). The trial judge, sitting as the trier of fact, carefully parsed through the different definitions and applied the correct one. Given that, even if Dr. Ophoven's testimony could be attributed to some deficiency on counsel's part, Gomez has not shown a reasonable probability that the result would be different.

Under RCW 9A.32.055(1), "A person is guilty of homicide by abuse if, under circumstances manifesting an extreme indifference to human life, the person causes the death of a child. . . , and the person has previously engaged in a *pattern or practice of assault or torture* of said child." (Emphasis added.) The name of this crime—homicide by abuse—is somewhat of a misnomer, as was noted by the trial court. *See* VRP (Mar. 28, 2007) at 12. In other words, although the crime is called "homicide by abuse," abuse is not actually an element of the crime.

Under our law, abuse can be something very different from assault and torture. Commendably, Judge Antosz acknowledged this distinction several times in his verdict:

> [I]f you look at the definition of abuse [it] is a different concept [from assault]. It doesn't require an intent to harm. Abuse or neglect can be simply the result of not laying hands on a child. It can be the result of leaving a child in a dangerous position and causing harm. So this is a different test than just simply of was there . . . abuse here.

*Id.*

Notably, Judge Antosz explained, "[S]ome physicians testified that they were clear acts of abuse. And, again, that's not the test. It's not abuse. It's whether they were assaults." *Id.* at 29; *see also id.* at 40 ("So, for instance, when the experts testify that abuse occurred, the Court has to go further than that to determine if assault occurred. Every assault is an abuse. Not every act of abuse is an assault."). Judge Antosz further explained his belief that "the Court must look at each injury individually and determine whether the State has proven beyond a reasonable doubt that the Defendant previously engaged in a pattern or practice of assaults." *Id.* at 19. With this in mind, Judge Antosz determined that the upper arm injury, occipital fracture and epidural hemorrhage, bruised/gouged ear injuries, and lacerated nipples were all the result of assaults by Gomez.

These excerpts from Judge Antosz's verdict are especially crucial because this was a bench trial—not a jury trial. The transcript provides an

accurate accounting of what Judge Antosz considered when rendering his decision. Because this was a bench trial, we can be certain that there was no confusion regarding the abuse/assault distinction. We know this because Judge Antosz made an outstanding record on the point. This further supports the conclusion that Gomez was not prejudiced by Dr. Ophoven's concession of abuse.

Moser's alleged failure to prevent Dr. Ophoven from conceding abuse at trial did not constitute ineffective assistance of counsel. Moser's preparation of Dr. Ophoven fell within the acceptable range of professionally competent behavior. Moreover, based on the record at hand, it is apparent that Dr. Ophoven's testimony regarding previous abuse did not prejudice Gomez. This is evident because abuse is not an element of homicide by abuse, and Judge Antosz made it abundantly clear that he understood and respected this distinction.

## CONCLUSION

We conclude that Moser's representation of both Arechiga and Gomez did not constitute an actual conflict of interest. We further conclude that Moser's performance fell within the acceptable range of reasonably effective assistance with respect to his experience, use of interpreters, investigation of

lay witnesses, investigation of expert witnesses, preparation of Gomez for trial, and preparation of Dr. Ophoven for trial. We, therefore, deny Gomez's personal restraint petition.

*In re Pers. Restraint of Gomez*
No. 86711-9

34

WE CONCUR:

No. 86711-9

OWENS, J. (concurring in part/dissenting in part) — Criminal defendants in this country have the constitutional right to effective assistance of counsel even if they do not speak English and even if they are accused of a heinous crime. While I agree with the majority on several points, I disagree that counsel's use of interpreters, investigation of experts, and preparation of the expert for trial provided Maribel Gomez with effective assistance of counsel. Counsel was deficient in this case when he failed to use an interpreter for the majority of his conversations with his non-English-speaking client. Additionally, counsel was deficient when he failed to locate an expert to testify about the cause of the victim's preexisting injuries when that testimony was essential to the defense. That failure was compounded when counsel did not adequately prepare the expert that he did secure for trial. These deficiencies fell below an objective standard of reasonable performance and prejudiced the defendant in this case. Therefore, I respectfully dissent.

*In re Pers. Restraint of Gomez*
No. 86711-9
Owens, J., concurring in part/dissenting in part

*Counsel's Use of Interpreters Was Deficient*

The majority concludes that Gomez's attorney, Robert Moser, provided effective assistance even though he primarily communicated with his non-English-speaking client without using an interpreter. I disagree. Defense counsel has a duty to consult with the defendant on her trial rights and defense strategy. *Florida v. Nixon*, 543 U.S. 175, 187, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004). The Ninth Circuit has stated that when communication between defense counsel and the defendant necessarily depends on an intermediary, defense counsel must provide "[a]n *accurate and complete* translation of all attorney-client communications" for the defendant to actually receive effective assistance. *Chacon v. Wood*, 36 F.3d 1459, 1464-65 (9th Cir. 1994) (emphasis added).

Gomez primarily speaks Spanish and her English skills are poor, but as Moser admitted in his declaration, "Usually [he and Gomez] would communicate without an interpreter." App. 4, at 4.[1] Moser's lack of communication frustrated Gomez, as she felt that she never had the "chance to give him a complete account of all the events." App. 3, at 11. Occasionally Moser would use a friend as an informal interpreter, and I agree that that is not, by itself, deficient performance. *See United States v. Valdivia*, 60 F.3d 594, 595 (9th Cir. 1995). But I disagree that Moser provided effective

_____

[1] Like the majority, all citations to the appendix relate to the appendices attached to the amended opening brief of the petitioner.

2

*In re Pers. Restraint of Gomez*
No. 86711-9
Owens, J., concurring in part/dissenting in part

assistance when he primarily communicated with his non-English-speaking client without an interpreter. An attorney must be able to communicate with his or her client at all times. That way a defendant can accurately convey the facts to the attorney, help make strategic decisions, and actively participate in our judicial process. I fear that the majority's holding will weaken the public's confidence in our judicial system, especially among those who do not speak English.

*Counsel's Investigation of Expert Witnesses Was Deficient*

Additionally, Moser's investigation fell below an objective standard of reasonableness because he failed to investigate certain expert witnesses. Moser did not retain an independent medical expert for the dependency proceedings and admits that he did not understand the science involved in Gomez's criminal defense until after the start of trial. Moser states that he pursued more than five experts in pediatric forensic pathology and epilepsy but was only able to retain Dr. Janice Ophoven—an expert in diagnosing the manner and cause of child injuries and death. When the State brought the additional charge of homicide by abuse, one of the two elements of which is a pattern or practice of assault of a child, Moser informed the court that an adequate defense of Gomez would now require an expert opinion on whether Rafael had been abused. Yet, Moser never had Dr. Ophoven opine on whether Rafael's previous injuries resulted from abuse, accident, or some other cause. This decision—or lack thereof—is even more troubling in light of the fact that one expert Moser spoke with

*In re Pers. Restraint of Gomez*
No. 86711-9
Owens, J., concurring in part/dissenting in part

during his investigation had led him to believe that Rafael suffered from epilepsy. Epilepsy would have explained some of his head injuries and perhaps the odd behaviors that Gomez reported.

I disagree with the majority that Moser's failure to investigate experts should be given "great deference" as part of counsel's trial strategy. Majority at 22-23. Moser's failures were not strategic decisions picked after weighing competing options for providing an effective defense. Rather, Moser omitted *necessary* expert opinions for Gomez's defense and did not pursue a reasonable, alternative explanation for the child's injuries. And, as further explained below, his deficient investigation resulted in his expert conceding abuse in a homicide by abuse case without independently making a determination on that issue.

In sum, the facts show that Moser knew that Gomez's defense required an expert opinion on Rafael's injuries and yet he inexplicably failed to have his qualified expert provide such an opinion. Accordingly, I conclude that Moser made an objectively unreasonable investigation of expert witnesses.

*Counsel's Preparation of Dr. Ophoven Was Deficient*

Moser's preparation of Dr. Ophoven for trial also fell below an objective standard of reasonableness when he failed to provide her with necessary medical records on time and inform her of the elements of homicide by abuse. The Ninth Circuit has held that "when the defense's only expert requests relevant information

*In re Pers. Restraint of Gomez*
No. 86711-9
Owens, J., concurring in part/dissenting in part

which is readily available, counsel inexplicably does not even attempt to provide it, and counsel then presents the expert's flawed testimony at trial, counsel's performance is deficient." *Bloom v. Calderon*, 132 F.3d 1267, 1278 (9th Cir. 1997). Similarly, the Sixth Circuit has held that defense counsel "cannot be deemed effective where he hires an expert consultant and then either willfully or negligently keeps himself in the dark about what that expert is doing, and what the basis for the expert's opinion is." *Richey v. Bradshaw*, 498 F.3d 344, 362-63 (6th Cir. 2007).

As in *Bloom* and *Richey*, Moser's failure to prepare Dr. Ophoven was deficient. Moser's only expert witness was Dr. Ophoven. In July 2005 and January 2006, she asked Moser to send her critical autopsy slides and radiology images so she could determine Rafael's cause of death. Moser failed to respond to Dr. Ophoven's requests. Dr. Ophoven says she finally received the slides after the start of trial, while Moser says he received the slides in the fall of 2006 and gave them to Dr. Ophoven about a month before trial. In either case Moser's failure to furnish the documents is inexplicable, as even he admits. Furthermore, while Moser retained Dr. Ophoven to testify on Rafael's cause of death but not on his abuse, he gave her grounds to believe that Rafael had been abused and informed her of the homicide by abuse charge without providing her with the elements of the charge. Moser then failed to confirm Dr. Ophoven's testimony as to abuse because at trial she conceded that Rafael had been abused and based on that belief, she opined that the cause of death was

*In re Pers. Restraint of Gomez*
No. 86711-9
Owens, J., concurring in part/dissenting in part

undetermined. Dr. Ophoven states that had she known that abuse was a question of fact for trial, she would have opined that the cause of death was natural instead of undetermined. I would hold that Moser's preparation of Dr. Ophoven for trial was deficient because he negligently kept himself in the dark as to his expert's testimony, failed to provide his expert with requested information that was readily available, and then presented her flawed testimony at trial.

*Counsel's Deficiencies Prejudiced the Defendant*

Moser's deficient use of interpreters, investigation of expert witnesses, and preparation of Dr. Ophoven for trial prejudiced Gomez's defense. To show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A reviewing court considers the totality of the evidence before the judge. *Id.* at 695.

Homicide by abuse has only two essential elements: causing the death of a child and a pattern or practice of assault or torture of said child. RCW 9A.32.055(1). Although Moser had Dr. Ophoven opine on the cause of Rafael's death, he chose not to have her opine on whether Rafael's injuries were the result of a pattern or practice of assault. Thus, the defense had no expert opinion to rebut the State's expert's

6

*In re Pers. Restraint of Gomez*
No. 86711-9
Owens, J., concurring in part/dissenting in part

opinion that Rafael's injuries were the result of a pattern or practice of assault and, moreover, had no expert opinion to support Gomez's and Jose Arechiga's testimony that Rafael's injuries were accidental or the result of his odd behaviors.

The prejudicial effect of not having Dr. Ophoven opine on Rafael's injuries was compounded by Moser's preparation of her for trial. At trial, Dr. Ophoven conceded that Rafael's injuries were the result of abuse because of a miscommunication between Moser and her. Thus, not only did the defense lack an advantageous medical opinion on Rafael's injuries, it essentially conceded one element of homicide by abuse and undercut Gomez's and Arechiga's testimony. Moreover, the miscommunication damaged the defense's response to the other element of homicide by abuse because Dr. Ophoven's belief that Rafael had been abused led her to report the cause of Rafael's death as undetermined, rather than report the cause as natural as she now states she would have done had she been informed. In sum, Moser's preparation of Dr. Ophoven for trial resulted in giving away one element of homicide by abuse and weakening the defense's rebuttal on the other element.

These errors, coupled with Moser's failure to use interpreters, undermine my confidence in the outcome of Gomez's trial. Taking all the evidence into account, I would hold that there is a reasonable probability that Moser's deficient performance changed the outcome of her trial. Accordingly, I would grant Gomez's personal

7

*In re Pers. Restraint of Gomez*
No. 86711-9
Owens, J., concurring in part/dissenting in part

restraint petition, vacate the conviction for homicide by abuse, and remand to the

superior court for any further proceedings consistent with those rulings.

Owens, J.

Gordon McCloud, J.

Fairhurst, C.J.

No. 86711-9

WIGGINS, J. (concurring in part with the concurrence/dissent) – I concur in part with the concurrence/dissent. Maribel Gomez established a prima facie showing of actual and substantial prejudice from receiving ineffective assistance of counsel. However, because the extent of prejudice is unclear from the record, we should remand the petition for a reference hearing. *See* RAP 16.11(b); *In re Pers. Restraint of Riley*, 122 Wn.2d 772, 782, 863 P.2d 554 (1993); *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 885, 828 P.2d 1086 (1992). At the reference hearing, the court should inquire into the prejudicial effect of defense attorney Robert Moser's deficient use of interpreters and preparation of Dr. Janice Ophoven.

*Deficient use of interpreters.* The extent of the prejudice resulting from Robert Moser's minimal use of an interpreter is unclear. According to Moser, Gomez's English language skills "were not very good," and he usually communicated with Gomez without an interpreter. Am. Opening Br. of Pet'r, App. 4, at 4. There is evidence, however, that Gomez hired interpreters on at least three occasions and that Gomez's friends would sometimes interpret. Id. at 3-4. It is not clear from the record how well Gomez speaks and understands English and whether using an interpreter would have actually altered the outcome of trial (e.g., whether Gomez would have revealed information that would have resulted in a different verdict).

1

*Deficient preparation of expert witness.* The prejudicial effect of Moser's deficient preparation of Dr. Ophoven is also unclear. The court should inquire as to what Dr. Ophoven would have testified had Moser properly prepared her.

Therefore, I would remand the petition for a reference hearing to resolve how the ineffective assistance of counsel affected Gomez's trial. I dissent from the majority opinion and concur in part with the concurring/dissenting opinion.

_____
Wiggins, J.